# No. 05-51209

# In the United States Court of Appeals
# for the Fifth Circuit

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

vs.

JUAN VICTOR VALLES, also known as Smiley;
JOHNNY GARCIA-ESPARZA, also known as Gira;
SAMMY GARCIA, also known as Spiderman;
JIMMY ZAVALA, also known as Panson, also known as Gordo,

*Defendants-Appellants.*

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS

## BRIEF OF DEFENDANT-APPELLANT JIMMY ZAVALA

ADRIENNE URRUTIA WISENBERG
Wisenberg & Wisenberg, PLLC
1711 N Street, N.W.
Second Floor
Washington, D.C. 20036
Telephone (202) 261-3649
Fax (202) 293-0701

*Attorney for Defendant-Appellant Zavala*

i

## CERTIFICATE OF INTERESTED PERSONS
### United States v. Jimmy Zavala
### No. 05-51209

The undersigned counsel of record certifies that the persons having an interest in the outcome of this case are those listed below:

1.    **Jimmy Zavala,** Defendant-Appellant;

2.    **Johnny Sutton**, U.S. Attorney;

3.    **Joey Contreras** and **Joe Sepeda**, Assistant U.S. Attorneys, who represented Plaintiff-Appellee in the district court;

4.    **Terry McDonald** and **Steve Pickell**, Attorneys at Law, who represented Defendant-Appellant in the district court;

5.    **Adrienne Urrutia Wisenberg**, Wisenberg & Wisenberg PLLC, who represents Defendant-Appellant in this Court.

This certificate is made so the judges of this Court may evaluate possible disqualification or recusal.

ADRIENNE URRUTIA WISENBERG

*Attorney for Defendant-Appellant*

ii

## REQUEST FOR ORAL ARGUMENT

Defendant-Appellant Jimmy Zavala requests oral argument pursuant to Federal Rule of Appellate Procedure 34(a) and Fifth Circuit Rule 28.2.4. Due to the importance of the issues raised, and the size and complexity of the case, counsel believes that oral argument would aid the Court's decision making process.

**TABLE OF CONTENTS**

CERTIFICATE OF INTERESTED PERSONS...............................................ii

REQUEST FOR ORAL ARGUMENT.........................................................iii

TABLE OF AUTHORITIES....................................................................vi

    Cases..................................................................................vi

    Constitutional Provisions....................................................vii

    Statutes.............................................................................vii

    Rule...................................................................................vii

    Guidelines…………………………………………………..viii

SUBJECT MATTER AND APPELLATE JURISDICTION......................viii

ISSUES PRESENTED FOR REVIEW.............................................…...1

STATEMENT OF THE CASE.................................................................2

SUMMARY OF THE ARGUMENTS.......................................................9

ARGUMENTS AND AUTHORITIES......................................................13

I.   THE DISTRICT COURT ERRED IN FAILING TO GRANT ZAVALA'S MOTION FOR MISTRIAL WHEN GOVERNMENT WITNESS LUIS ADAME DISPLAYED HIS GUNSHOT WOUNDS TO THE JURY AFTER THE DISTRICT COURT PROHIBITED HIM FROM DOING SO. …………………………………………………...13

II.  THE DISTRICT COURT ERRED WHEN IT CONSIDERED THE MURDER OF JOSE LUIS MORENO AS A SENTENCING FACTOR AFTER THE JURY SPECIFICALLY FOUND THAT ZAVALA DID NOT INTENTIONALLY OR KNOWINGLY KILL MORENO…………………………………………………………20

III. STATEMENT REGARDING ADOPTION OF CO-APPELLANTS' ARGUMENTS..28

CONCLUSION................................................................................29

CERTIFICATE OF SERVICE................................................................30

CERTIFICATE OF COMPLIANCE…………………………………31

# TABLE OF AUTHORITIES

**Cases**

*American Civil Liberties Union v. Mississippi*,
  911 F.2d 1066 (5th Cir. 1990) ……………………………………………16

*In re Winship*,
  397 U.S. 358 (1970) ………………………………………………….25, 27

*United States v. Anderson,*
  933 F.2d 1261 (5th Cir. 1991) ………………………………………...16

*United States v. Armendariz*,
  451 F.3d 352 (5th Cir. Jun. 5, 2006)…………………………………….. 23

*United States v. Booker*,
  543 U.S. 220 (2005)………………………………………… 2, 11, 23-27

*United States v. Carrillo*,
  981 F2d 772 (5th Cir. 1993) …………………………………………16

*United States v. Creech*,
  408 F.3d 264 (5th Cir. 2005)…………………………………………...23

*United States v. Faust*,
  2006 WL 2035467(11th Cir. Jul. 21, 2006) …………………………...24

*United States v. Klein*,
  546 F.2d 1259 (5th Cir. 1977)…………………………………………... 17

*United States v. Krout*,
56 F.3d 643, 647 (5th Cir. 1995) ……………………………………………16

*United States v. Pimental*,
  367 F.Supp.2d 143 (D.Mass.2005) ……………………………………24

*United States v. Ramirez-Velasquez*,
  322 F.3d 868 (5th Cir. 2003) …………………………………………...17

*United States v. Shaw*,
   920 F.2d 1225 (5th Cir. 1991) …………………………………………16

*United States v. Villegas*,
   404 F.3d 355 (5th Cir. 2005) ………………………………………..23

*United States v. Watts*,
   519 U.S. 148 (1997) …………………………………………………..23-26

**Constitutional Provisions**

U.S. CONST. amend. V. ......................................................1, 2, 11, 24-26

U.S. Const. amend VI………………………………………………24, 27

**Statutes**

18 U.S.C. § 2………………………………………………………………..3

18 U.S.C. § 924(c)………………………………………………………….3

18 U.S.C. § 924(o)…………………………………………………………3

18 U.S.C. § 1956(h)………………………………………………………..3

18 U.S.C. § 3231..................................................................………ix

18 U.S.C. § 3742(a)..............................................................……..,,,,ix

21 U.S.C. § 841…………………………………………………………..3

28 U.S.C. § 1291......................................................................................ix

**Rule**

Fed. R. App. P. 4(b)………………………………………………………ix

**Sentencing Guidelines**

U.S.S.G. §2A1.1……………………………………………………. 21, 22

U.S.S.G. §6A1.3 …………………………………………………22, 26

U.S.S.G. Ch. 5, Part A (Sentencing Table)……………………………….. 22

## SUBJECT MATTER AND APPELLATE JURISDICTION

1. **Subject Matter Jurisdiction in the District Court.** This case arose from the prosecution of an alleged offense against the laws of the United States. The district court had jurisdiction of this case under 18 U.S.C. § 3231.

2. **Jurisdiction in the Court of Appeals.** This is a direct appeal from a final decision of the U.S. District Court for the Western District of Texas, entering a judgment of conviction and imposing an imprisonment sentence under the Sentencing Reform Act of 1984. This Court has jurisdiction of the appeal under 18 U.S.C. § 3742(a) and 28 U.S.C. § 1291.

Under Federal Rule of Appellate Procedure 4(b), a criminal defendant who wishes to appeal a district court judgment must file notice of appeal in the district court within 10 days after the entry either of the judgment or order appealed from, or of a notice of appeal by the Government. The rule also provides that a notice filed after announcement of the decision, sentence, or order appealed from, but before entry of the judgment or order, is treated as filed on the date of, and after, entry of the order. Here, the judgment and commitment order was entered on August 23, 2005, and the notice of appeal was filed on August 22, 2006.

ix

## ISSUES PRESENTED

1.      Whether the district court's failure to grant Zavala's motion for mistrial after a Government witness displayed his gunshot wounds for the jury, contrary to the district court's instructions not to do so, violated Zavala's due process and fair trial rights.

2.      Whether the district court's consideration at sentencing of conduct of which Zavala was specifically acquitted by the jury violated Zavala's due process and fair trial rights, as well as the spirit of the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005).

**STATEMENT OF THE CASE**

1.  **Nature of the Case.**

Defendant-Appellant Jimmy Zavala was convicted of conspiracy, drug trafficking, and firearms offenses related to his alleged role as a leader of the Texas Mexican Mafia (TMM). Zavala went to trial before a jury, was convicted on all counts, and was sentenced to a term of natural life in prison. On appeal, he argues that the district court erred in failing to grant his motion for mistrial after a Government witness, who had accused Zavala of ordering that he be killed, and had accused a codefendant of shooting him, displayed his wounds for the jury contrary to the district court's specific instruction that he refrain from doing so. He also argues that the district court's decision at sentencing to consider conduct of which the jury specifically absolved Zavala, violates due process, Zavala's right to a fair trial, and the spirit of the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005).

2.  **Course of Proceedings and Disposition in the Court Below.**

A 33-count indictment charged Zavala and 27 others with drug conspiracy, firearms, and money laundering offenses related to the operations of the TMM. Specifically, Zavala was charged in Count One of the indictment with conspiracy to distribute and possess with intent to distribute one kilogram or

more of heroin and five kilograms or more of heroin, in violation of 21 U.S.C. § 846, § 841(a)(1), and § 841(b)(1)(A); in Count Twenty-One with possession with intent to distribute 500 grams or more of cocaine, and aiding and abetting the offense, on April 22, 2004, in violation of 21 U.S.C. § 841(a)(1), § 841(b)(1)(B), and 18 U.S.C. § 2; in Count Thirty with conspiracy to use, carry, or possess at least one firearm during and in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c) and (o), and in Count Thirty-One with using, carrying, or possessing at least one firearm during and in furtherance of a drug trafficking crime on April 29, 2004, and aiding and abetting, in violation of 18 U.S.C. § 2; in Count Thirty-Two with using, carrying, or possessing at least one firearm during and in furtherance of a drug trafficking offense on May 14, 2003, in violation of 18 U.S.C. § 924(c), and aiding and abetting in violation of 18 U.S.C. § 2; and in Count Thirty-Three with conspiracy to launder money, in violation of 18 U.S.C. § 1956(h). (1 R. 7-35.)[1]

Zavala and three codefendants went to trial before a jury; Zavala was convicted on all counts, and was sentenced to a term of life imprisonment on

---

[1]The pleadings volumes that pertain to Zavala are cited "[volume] R. [page]." The jury trial and sentencing volumes are cited "[date] Tr. [page]." The sentencing transcript is cited "Sent. Tr. [page]." The presentence report is cited P.R. [page].

Count One, 480 months' imprisonment on Count Twenty-One, and 240 months' imprisonment on Counts Thirty and Thirty-One. The sentences on Counts One, Twenty-One, Thirty, and Thirty-One were ordered to run concurrently. The court also pronounced consecutive sentences of 60 months' imprisonment on Count Thirty-One, and 300 months' imprisonment on Count Thirty-Two. (2 R. 357-63.) The jury also decided several special issues that were submitted; it determined that Zavala was a leader or organizer of the conspiracy, and it found that he committed a home invasion on May 14, 2003. However, the jury answered negatively when asked whether it found that Zavala had intentionally or knowingly killed Jose Luis Moreno. (2 Tr. 334.)

3.  **Statement of Facts**.

The Government's evidence showed that the Texas Mexican Mafia (TMM) started in the Texas prison system in the mid-1980s. The organization's president, Heriberto Huerta, who is currently in federal prison in Colorado, started TMM with the permission of the leadership of the original Mexican Mafia, which began in California. (1 Tr. 197.) One Government witness, a San Antonio, Texas, police officer named Val Lopez who professes expertise with regard to TMM, testified that, although TMM started as a gang formed to protect its members in prison, it now operates outside of the prison system, and maintains chapters in all of Texas' major cities. San Antonio,

4

Texas, according to Lopez, has the largest and most active chapter of TMM. (1 Tr. 205.)

The evidence showed that members of TMM attain rank, similar to those of military soldiers and officers. (1 Tr. 200.) The organization's purpose is drug trafficking, but TMM also controls non-members' drug dealing by assessing a street tax of ten percent. (2 Tr. 267.) According to Officer Lopez, one way to gain membership in TMM is to commit a crime, including the murder of someone adverse to TMM. The Government's evidence demonstrated that Daniel Leza, a codefendant who pleaded guilty prior to trial, was a vice president of TMM at the time of the alleged conspiracy. (2 Tr. 296.) Zavala was, at the time, a general, and another codefendant who pleaded guilty, Jesse Ramirez, was a captain. (2 Tr. 396-97.) The Government averred that these three men conspired to distribute drugs and order murders during the time alleged in the indictment. The Government also alleged that the men collected a larger proportion of the proceeds from the street tax because of their roles, and that they had the authority to vest other members with weapons to be used for official TMM business, such as murders, robberies, and collections of the street tax. The firearms, which were considered property of TMM, were kept at a central location. (2 Tr. 272; 3 Tr. 618.)

The Government's summary witnesses, Officer Lopez and Drug Enforcement Administration Special Agent Nancy Sanford, described to the

jury the way TMM was organized. They testified, for instance, that San Antonio was divided into quadrants, and that certain members were responsible for finding out who in his area was selling drugs, and then collecting the street tax. (2 Tr. 248.) Agent Sanford testified that the DEA and other agencies had investigated TMM in the past, and that the investigation that resulted in the instant indictment began in August 2003. (2 Tr. 332.)

The Government alleged that, beginning in the summer of 2003, Zavala was in charge of getting cocaine for distribution by the TMM. (2 Tr. 397; 7 Tr. 2047.) Codefendant Garcia-Esparza was responsible for getting heroin for TMM to sell. (3 Tr. 510.) Cooperating codefendants testified that Zavala would traffic one or two kilograms of cocaine each week for TMM. (3 Tr. 573, 589; 5 Tr. 1231.) The Government alleged in Count Twenty-One, and proved, that on April 22, 2004, Zavala was present for the seizure of 998.7 grams of cocaine. (5 Tr. 1393, 1425.) It also alleged in Counts Thirty and Thirty-One, that Zavala used, carried or possessed about 50 firearms that were seized on April 29, 2004, in furtherance of his drug dealing. The Government's proof with respect to the weapons consisted of cooperating codefendants testifying that Zavala, as a general, was responsible for assigning "house" weapons to TMM members doing official business. (3 Tr. 618.) Additionally, the Government alleged in Count Thirty-Two, and proved, that Zavala was present when weapons and 76 grams of cocaine were seized on May 14, 2004. (9 Tr.

2426-27.)

The Government also proved through recorded telephone conversations, informants, and cooperating codefendants charged in the indictment that Zavala, as a general in TMM, was responsible for distributing cocaine and directing other members to collect street taxes. The evidence, which once again came largely from cooperating codefendants, was that Zavala ordered the murders of individuals who refused to pay the street tax, or who were adverse to the TMM. Witnesses placed Zavala in the role of organizing meetings and directing the logistics of drug sales, tax collections, and hits. (2 Tr. 405-10, 430-32; 3 Tr. 572-73, 589, 616-18, 715-20, 4 Tr. 1035-45.)

The Government alleged, but failed to prove, that Zavala murdered Jose Luis Moreno, who was suspected of working as an informant against TMM. (10 Tr. 2525-41.) Moreno was last seen with Zavala, but the jury was given a special issue concerning the murder, and found that the evidence failed to prove that Zavala had murdered Moreno. (11 Tr. 2763.) Nevertheless, at sentencing the district court cross-referenced Zavala's sentencing-guideline calculation by using the murder guideline, which required a mandatory life sentence. Zavala objected to this procedure, citing the jury's negative answer to the special issue regarding Moreno, and the Government's failure to prove the allegation. The objection was overruled, and the district court expressly found that Zavala's participation in Moreno's murder was proven by

preponderance of the evidence, which was sufficient to employ the murder guideline. (Sent. Tr. 27-42.)

## SUMMARY OF THE ARGUMENTS

**I. The District Court Erred in Failing to Grant Zavala's Motion for Mistrial When Government Witness Luis Adame Displayed His Gunshot Wounds to the Jury After the District Court Prohibited Him From Doing So.**

At the end of this lengthy, sometimes repetitive and tedious, conspiracy trial, the Government presented the patently unreliable testimony of Luis Adame. Adame's presentation was dramatic, complete with anxiety attacks and emotional outbursts. Among Adame's claims was that he was targeted by TMM for refusing to pay the street tax, and Zavala ordered that he be killed by codefendant Juan Valles. Adame knew both men from their drug-dealing activities together, and he claimed to be afraid when he found out that they wanted him dead. Adame said he moved to a new residence and watched his back, but despite his cautiousness, one day when he was getting out of his car, a van pulled up and men jumped out and shot at him. The man who shot him repeatedly, he claimed, was codefendant Valles.

Adame's story fell apart when defense counsel confronted him with the fact that, according to the police report of the incident, he was unable to identify his attackers. Adame became irate when confronted with this fact, claiming that he deliberately failed to identify the assailants because he wanted to "get them" himself. Then, on redirect, the prosecutor invited Adame to

9

show the jury his scars, and the district court immediately sustained the defense's objection. However later, despite the court's obvious ruling that it was inappropriate and highly prejudicial, Adame spontaneously stood up and showed his scars, proclaiming: "this is what he did to me."

The district court immediately ordered Adame to leave the witness stand, and told the jury to "pretend the gentleman was never there." The court overruled motions for mistrial as to all defendants. In its general instructions prior to deliberations, the district court told the jury that all of Adame's testimony was stricken, and that they could not consider it for any reason.

Here, Zavala argues that, despite the district court's efforts to cure the prejudice of Adame's outburst, the jury could not help but to consider Adame's testimony and his display of his physical wounds. Even on the cold appellate record, Adame's gestures stand in such contrast to the rest of the evidence that there was simply no way for the jury to disregard his tesitmony, despite being instructed to do so. Some error is simply so prejudicial that no instruction can cure it. This case presents just such an error. On this basis, this Court should grant a new trial.

**II.    The District Court Erred When It Considered the Murder of Jose Luis Moreno as a Sentencing Factor After the Jury Specifically Found That Zavala Did Not Intentionally or Knowingly Kill Moreno.**

The district court submitted several special issues to the jury regarding potentially sentence-enhancing factors. One such special issue asked the jury to determine whether it found, beyond a reasonable doubt, that Zavala intentionally or knowingly killed Jose Luis Moreno. The jury answered that question "no." Nevertheless, upon recognizing that a mandatory life sentence for Zavala would depend on finding that he killed someone, the district court disregarded the jury's finding and concluded otherwise, determining that the allegation that Zavala had killed Moreno was sufficiently reliable to be considered at sentencing. The court imposed a life sentence on Count One of the indictment by cross-referencing to the murder guideline. Zavala's objection to this procedure was overruled.

Zavala argues that the district court's consideration of conduct that the jury expressly found he did not commit violates basic notions of due process, as well as his right to a fair trial. Zavala submits that *Booker* and its progeny force a reexamination of the notion that acquitted conduct may be used to enhance a defendant's sentence. He also submits that, based on well-established precedent, the proper standard of proof at sentencing should be

11

beyond a reasonable doubt, and that the jury's verdict on the Moreno matter should, for this reason, be heeded. Finally, Zavala submits that, under any standard of proof, the Government simply failed to reliably prove that Zavala had any role in the Moreno murder, or any murder. For these reasons, his sentence must be vacated and the case remanded for resentencing.

## ARGUMENTS AND AUTHORITIES

**I.  THE DISTRICT COURT ERRED IN FAILING TO GRANT ZAVALA'S MOTION FOR MISTRIAL WHEN GOVERNMENT WITNESS LUIS ADAME DISPLAYED HIS GUNSHOT WOUNDS TO THE JURY AFTER THE DISTRICT COURT PROHIBITED HIM FROM DOING SO.**

The Government called Luis Adame Jr., a former member of TMM, who identified Zavala as the member in charge of San Antonio's north side. However, just moments into his testimony, Adame became so anxious and nervous that he could not continue. (10 Tr. 2501-05.) The Government called a few other witnesses then brought Adame back; again he had to leave the courtroom due to his anxiety. (10 Tr. 2523.)

Obviously seeking an explanation for Adame's odd behavior, defense counsel inquired; after an off-the-record discussion, Zavala's defense lawyer stated: "Apparently this witness's father was murdered and there's some indication it might have been related to the Mexican Mafia. Now I asked Mr. Contreras if he had planned to go into that and he said he did, and I'm going to object to it unless it's tied to one of our clients. It's much more prejudicial than probative especially in light of the fact that this man has been in and out of this courtroom four times." (10 Tr. 2542.) The district court directed the prosecutor not to broach that topic, and the prosecutor agreed not to. (10 Tr. 2542-43.) The on-the-record discussion regarding Adame did not, at this point, touch on

13

the topic that Adame himself alleged that he had been shot by codefendant Valles at the direction of Zavala.[2]

When Adame's testimony resumed, he claimed that Zavala had attempted to purchase cocaine from him in 2003, but that he also attempted to impose the ten percent street tax on the transaction. (10 Tr. 2548-49.) Adame testified that, when he objected to paying the tax, Zavala ordered that Adame be killed. (10 Tr. 2558.) Adame testified that he watched his back and even moved to another residence, but eventually, he was shot several times by codefendant Valles. (10 Tr. 2559.) Adame testified that he was severely injured; he spent a month in the hospital, had to have a colostomy, and was in a wheelchair for a year. (10 Tr. 2560.)

On cross-examination, when confronted with the police report of the incident, Adame reluctantly admitted that he told the police he did not know any of the people who shot him. After repeated impeachments of Adame, the prosecutor began his redirect-examination by telling Adame: "Just to make sure you didn't make up this whole shooting thing, will you stand up and show us your scars?" Defense counsel's objection was sustained. (10 Tr. 2591.)

---

[2]It is unclear from the record whether defense counsel knew that Adame himself maintained he had been shot by TMM members, or whether he only knew of the allegation that Adame's father had been killed by TMM.

14

Then, on recross, the following exchange took place:

> Q  Do you remember telling him—and here the complainant is you.
> Do you remember telling him that you, Luis Adame: "Said he didn't
> know any of the people that got out of that van shooting at him"?
> Do you remember saying that, yes or no?
> A  The reason I said that is because—
> Q  Yes or no?
> A  I wanted to get them myself.
> Q  Yes or no?
> A  I wanted him myself.
> THE COURT:  Wait, wait.
> A  This is what he did to me.
> THE COURT:  Wait. Sit down.
> A  He shot me.
> THE COURT: Get him out of here. Out, out, out.
> MARSHALL: Step this way, please.
> THE COURT: I don't have time for nonsense. Out. And I'm going
> to  tell the prosecution don't ever bring someone who's just going to
> show a lot of nonsense. Next witness.
> [Defense counsel]:  May his testimony be --
> THE COURT:  It's all struck.  Let's go.
> [Defense counsel]:  Motion to disregard.
> THE COURT:  Motion to disregard. Just pretend the gentleman was
> never there.
> MR. CONTRERAS:  Dr. Kim Molina, Your Honor.
> [Defense counsel]: I'm sorry, Your Honor. I need to make a motion
> for mistrial.
> THE COURT:  I understand.  That's denied. Thank you. The motion
> is made as to each defendant and it's denied as to each defendant.

(10 Tr. 2600-01.)

Defense counsel requested a jury instruction regarding the exclusion of

Adame's testimony. (10 Tr. 2645.) As part of its general instructions, the

district court instructed the jury: "During the trial I sustained objections to

15

certain questions. You must disregard those questions entirely. Do not speculate as to what the witness would have said if permitted to answer the question. As I told you during the trial, I also struck the entire testimony of Luis Adame, and you are instructed to disregard his testimony in its entirety. You shall not consider any part of his testimony for any reason whatsoever. Your verdict must be solely based on the legally admissible evidence and testimony." (10 Tr. 2654.)

## A.  Standard of Review.

This Court reviews constitutional errors de novo. *United States v. Shaw*, 920 F.2d 1225, 1228 (5th Cir. 1991), (citing *American Civil Liberties Union v. Mississippi*, 911 F.2d 1066, 1069 (5th Cir. 1990)), *cert. denied*, 500 U.S. 926 (1991). The review of evidentiary rulings in criminal trials is necessarily heightened. *United States v. Carrillo*, 981 F2d 772, 774 (5th Cir. 1993) (citing *United States v. Anderson,* 933 F.2d 1261, 1268 (5th Cir. 1991). A district court's decision not to grant a mistrial is reviewed for abuse of discretion. *United States v. Krout*, 56 F.3d 643, 647 (5th Cir. 1995).

## B.  The District Court Erred in Denying the Motion for Mistrial Because Adame's Display of His Wounds Was So Highly Prejudicial as to Be Incurable.

16

When evidence is so extremely prejudicial as to be incurable, the district court must grant a mistrial. *United States v. Ramirez-Velasquez*, 322 F.3d 868, 878 (5th Cir. 2003) (citing *United States v. Klein*, 546 F.2d 1259, 1263 (5th Cir. 1977)). Here, the whole of Adame's testimony, and particularly his act in showing his scars to the jury from the witness stand, was highly prejudicial. Even the cold appellate record reveals the impact of Adame's theatrics from the moment he reached the witness stand; he was so nervous that he was unable to answer the prosecutor's questions initially, and he was allowed to leave and come back in later, only to fall apart again. Undoubtedly, especially at the end of a lengthy and very repetitive trial such as this, Adame had the jurors' full attention, and they were extremely curious about what he had to say. Yet, they had to wait until several other witnesses testified before Adames would reappear to tell his story.

When he did, Adame was factual and confident—stating that a friend had warned him that Zavala had put out the "green light" on him, and explaining that this meant, in TMM terms, that he was to be murdered. Adame dramatically recounted that he feared for his life, and even moved to a new address. But, his precautions failed to pay off—outside his residence one day a van drove up and a group of men, led by codefendant Valles, shot him several

17

times. Adame recalled the pain, stating that he called 9-1-1 to summon the police, then passed out. (10 Tr. 2559.)

Adame apparently failed to anticipate that defense counsel would have access to the police report of the incident, which stated that he did not recognize any of the men who shot at him.[3] The murder attempt had never been solved, and no arrests had been made due to Adame's failure to identify his attackers. When confronted with this inconsistency, Adame went on the defensive, attempting to explain that he deliberately failed to identify Valles because "I wanted him myself." (10 Tr. 2600-01.) The prosecutor had previously asked Adame to show his scars, and the district court sustained the defense objection to it. However, whether he did it of his own volition or to please the prosecutor, Adame chose to violate the district court's ruling by standing up and showing his scars to the jury. This outrageous display, especially in light of the drama surrounding Adame's testimony initially, was simply unforgettable.

The district court's curative instruction, while rapid, was unable to cure the

---

[3] The prosecutor claimed not to know whether a police report even existed, but on the district court's urging, he managed to get a copy of the report faxed to the district court's chambers so it could be used by the defense for cross-examination of Adame.

18

error. The district court told the jury to forget Adame's testimony. However, no jury could possibly forget a witness standing up showing his gunshot wounds, which he attributed directly to the defendants. Despite the district court's instruction that the was to "pretend the gentleman was never there," there was simply no way to forget Adame's dramatic display, nor could the jury be expected to forget his testimony that two of the defendants were directly responsible for his injuries, that he spent a month in the hospital and a year in a wheelchair.

**C.     Adame's Testimony Had a Substantial Impact on the Jury's Verdict Against Zavala and the Court's Instruction Could Not Cure It.**

By virtue of the fact that Zavala was alleged to have been a TMM "general," the Government's allegations against him were that he mainly directed the actions of others in the organization. Because of this, the Government had very few opportunities to show Zavala actually participating in TMM's criminal activities. In this respect, Adame was an important witness for the Government's case. His testimony, if believed by the jury, showed a direct link between Zavala and a violent act. Adame's outburst likely created a dramatic visual image for the jury of just what TMM was capable of doing. In this respect, Adame's testimony was particularly prejudicial to Zavala because

it labeled him a dangerous leader of TMM, and one who was ordering hits that were actually carried out. Because of the importance and prominence of Adame's testimony, the Government cannot credibly argue that it had no impact on the verdict against Zavala. For these reasons, Zavala's conviction should be vacated and the case remanded for a new trial.

**II.** **THE DISTRICT COURT ERRED WHEN IT CONSIDERED THE MURDER OF JOSE LUIS MORENO AS A SENTENCING FACTOR AFTER THE JURY SPECIFICALLY FOUND THAT ZAVALA DID NOT INTENTIONALLY OR KNOWINGLY KILL MORENO.**

At trial, the Government presented evidence that, in 2002, the skeletal remains of a man named Jose Luis Moreno were found in San Antonio, and that Moreno's murder was suspected to have been the doing of TMM, because Moreno had refused to pay TMM the required ten percent street tax for the sale of drugs. One Government witness, Joe Tamayo, suggested that Zavala was responsible for the murder because Tamayo had seen Zavala destroy a weapon, which Tamayo assumed was the murder weapon. However, the district court submitted a special issue to the jury asking whether the jury had concluded beyond a reasonable doubt that Zavala had intentionally or knowingly killed Jose Luis Moreno, and jury answered "no."

Nevertheless, the presentence report concluded that the information relevant to the murder of Moreno was sufficiently reliable to support the finding that "it was reasonably foreseeable that Zavala was responsible for

20

[Moreno's murder] and should be held accountable for [this act]." P.R. at 18. On this basis, the report averred that under guideline §2D1.1(d)(1), Zavala's guidelines could be cross-referenced to the guideline for murder, §2A1.1, because the murder was reasonably foreseeable, and because it would constitute a murder under the federal murder statute, 18 U.S.C. § 1111, if it had taken place in a federal jurisdiction. P.R. at 24.

Prior to sentencing, and again at the sentencing hearing, the defense objected to the inclusion of any murder allegations in the presentence report. Specifically, Zavala objected to inclusion of "the alleged murder of Jose Luis Moreno, that was presented to the jury and the jury found that that was not proven beyond a reasonable doubt." (Sent. Tr. At 27.) The district court, upon hearing the objection, asked the prosecutor: "So that part of the pre-sentence report can be revised, Mr. Contreras? The prosecutor said he did not believe revision was necessary, arguing that "In fact the Supreme Court has visited the issue. It said in *Watts vs. United States*, it says: 'Even conduct that has been acquitted can still be used to determine to (sic) guidelines because while the jury found it wasn't proven beyond a reasonable doubt, sentencing is determined by a preponderance of the evidence.'" (Sent. Tr. 27-29.) After resolving from other issues, the court revisited the issue of the

21

Moreno murder by asking the prosecutor: "Mr. Contreras, does this affect the guideline calculation in any event?" (Sent. Tr. 34.) The prosecutor then pointed out that, in order to utilize the cross-reference guideline for murder, and thus impose a mandatory life sentence, the court was find that Zavala was responsible for the murder.[4] At that point, the district court overruled the defense objection. (Sent. Tr. 34.)

The district court calculated the guidelines on the conspiracy count to be life imprisonment (Sent. Tr. 38), and then made the following finding as to the Moreno murder:

> The Court finds that although the jury made a finding the defendant was not responsible for the murder of Jose Luiz (sic) Moreno, the Court may still consider relevant information without regard to its admissibility under the rules of evidence as applicable to trial and sentencing proceedings. Because there is sufficient indicia of reliability to support its probable accuracy, and the defendant was responsible for the murder of Jose Luiz (sic) Moreno, and the guidelines provide for a cross-reference, the appropriate guideline and base offense level have been used and applied. That's U.S. Sentencing Guideline Section 6a1.3.

The district court also considered two other murders, those of Henry Cantu and Reymundo Ramirez, but neither of these crimes were submitted

---

[4] By cross-referencing to the murder guideline, §2A1.1, Zavala's base offense level was raised to Level 43. P.R. at 25. Level 43 requires a mandatory life sentence in any criminal history category. U.S.SG. Ch. 5, Part A (Sentencing Table).

22

as special issue to the jury. The defense objection to consideration of these murders was also overruled. (Sent. Tr. 41.)

After hearing allocution from counsel, the district court noted that it had "considered the guidelines in an advisory capacity and, pursuant to the Sentencing Reform Act and *U.S. v. Booker* and applicable case law thereafter, finds the guideline range is fair and reasonable in this case", and sentenced Zavala to a life sentence on the conspiracy count. (Sent. Tr. 45.)

## A.  Standard of Review.

Even after the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005), in which the sentencing guidelines were rendered advisory rather than mandatory, this Court reviews the district court's interpretation and application of the Guidelines de novo. *United States v. Armendariz*, 451 F.3d 352, 357 (5th Cir. Jun. 5, 2006) (citing *United States v. Villegas*, 404 F.3d 355, 359 (5th Cir. 2005). This Court "accept[s] findings of fact made in connection with sentencing unless clearly erroneous." *Id.* (citing *United States v. Creech*, 408 F.3d 264, 270 n.2 (5th Cir. 2005). Ultimately, however, this Court reviews the sentence for reasonableness, in accordance with *Booker*'s mandate. 543 U.S. at 261.

## B. The Spirit of *Booker*'s Holding Casts Doubt on *Watts*.

While *Booker* resolved many issues concerning the practicalities of

23

sentencing, it left open others, especially those concerning the burden of proof, and the continuing validity of the Supreme Court's opinion in *United States v. Watts*, 519 U.S. 148 (1997) (upholding sentence increase based on acquitted conduct). *See, e.g.*, *United States v. Pimental*, 367 F.Supp.2d 143, 152 (D.Mass.2005) ("even if the Sixth Amendment's jury trial guarantee is not directly implicated because the regime is no longer a mandatory one, the Fifth Amendment's Due Process requirement is"). Zavala submits that the appropriate standard of proof for any sentence-enhancing fact is proof beyond a reasonable doubt, and that neither due process nor the Sixth Amendment allows a court to consider acquitted conduct at sentencing.

"[I]t makes absolutely no sense to conclude that the Sixth Amendment is violated whenever facts essential to sentencing have been determined by a judge rather than a jury, ... and *also* conclude that the fruits of the jury's efforts can be ignored with impunity by the judge in sentencing." *Pimental*, 367 F. Supp.2d at 150. For this reason, the *Pimental* Court concluded, *Booker* and *Watts* are inconsistent with one another. Agreeing with *Pimental* that acquitted conduct should not be used to enhance a sentence, the concurring judge in *United States v. Faust*, 2006 WL 2035467(11th Cir. Jul. 21, 2006), observed that "[w]hen a sentencing judge finds facts that could, in themselves, constitute entirely free-standing offenses under the applicable law--that is, when an enhancement factor could have been named in the

24

indictment as a complete criminal charge—the Due Process Clause of the Fifth Amendment requires that those facts be proved beyond a reasonable doubt. *See In re Winship*, 397 U.S. 358, 364 (1970) ("[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged .... It is critical that ... every individual going about his ordinary affairs have confidence that his government cannot adjudge him guilty of a criminal offense without convincing a proper factfinder of his guilt with utmost certainty.")

Not only is *Watts* incongruent with *Booker* in the general sense, it is particularly so under the unique circumstances of Zavala's case. Here, perhaps due to the fact that *Booker* was new at the time of Zavala's trial, the jury was required to answer special issues concerning the evidence presented, and whether the Government had adequately proven the allegations that would later be used to enhance Zavala's sentence. Because of this unique circumstance, this Court has the benefit of the jury's insight concerning the Moreno murder. A jury's insight is rarely discounted in any other context, nor should it be in this instance. Obviously, the jury did not credit Tamayo's suggestion that Zavala killed Moreno, and answered the special issue "no." Now, for the district court to discount that verdict and reach its own conclusion, without making specific findings concerning what

evidence it relied upon to so conclude, seems to go against the spirit of *Booker* itself.

*Watts* now appears to be limited by *Booker*, and appears to be ripe for further reexamination. The merits majority in *Booker* went out of its way to limit both its reach and meaning. For example, Justice Stevens opined: "*Watts*…presented a very narrow question regarding the interaction of the Guidelines with the Double Jeopardy Clause, and did not even have the benefit of full briefing or oral argument. It is unsurprising that we failed to consider fully the issues presented to us[.]" *Booker*, 543 U.S. 220, 240 n. 4. For these reasons, considering conduct that a jury specifically decided was not adequately proven violates the spirit of *Booker*'s holding.

### C. Utilizing a Beyond-a-Reasonable-Doubt Standard Comports With Basic Notions of Due Process.

Curiously, neither Congress nor the Sentencing Commission has expressly stated that the preponderance standard is the prevailing standard at federal sentencings. The Sentencing Reform Act fails to address the topic at all, and the guidelines commentary merely provides that the Commission "believes that use of a preponderance of the evidence standard is appropriate to meet due process requirements and policy concerns in resolving disputes regarding application of the guidelines to the facts of a case." U.S.S.G. §6A1.3 This guideline, however, has not been substantively addressed since

*Booker*.

Moreover, when the *Winship* Court established that the beyond-a-reasonable-doubt standard could be derived from the Due Process Clause of the Fifth Amendment, it did so in the context of a juvenile proceeding. 397 U.S. 358 (1970). In that proceeding, to which the Sixth Amendment's jury trial guarantee did not apply, the Court's decision focused clearly on the concept that judges would apply the heightened standard of proof to give "concrete substance for the presumption of innocence—that bedrock axiomatic and elementary principle whose enforcement lies at the foundation of the administration of our criminal law." *Id.* at 363.

The same analysis applies to a federal sentencing, especially one in which the district court must affirmatively ignore a jury's decision under the higher standard that the defendant was not guilty of the conduct, and utilize the lower standard to impose a draconian sentence of life imprisonment. This procedure offends basic notions of due process and fundamental fairness, and cannot stand. For these reasons, Zavala's sentence should be vacated.

**D. Under Any Standard of Proof, the District Court Clearly Erred in Concluding That Zavala Was Responsible for Moreno's Murder.**

By any standard, the Government simply failed to prove that Zavala murdered Moreno. The entire allegation hinged on the testimony of Joe Tamayo, a convicted bank robber and TMM member whose duty was to destroy weapons. (10 Tr. 2609.) Tamayo stated that in July 2002, he was told that there was a weapon to be destroyed. Then Zavala appeared in the early morning hours with a gun, which Tamayo burned with a blow torch. (10 Tr. 2612-14.) Tamayo admitted that he based his conclusion that Zavala had murdered Moreno on the fact that he once heard Zavala say that he thought Moreno might be a "snitch." (10 Tr. 2617.) Tamayo's testimony simply lacks the indicia of reliability necessary to meet even the preponderance of the evidence standard advocated by the Government at sentencing. Tamayo's testimony is merely based on rumor and speculation, and not on any fact that sufficiently links Zavala to the murder of Moreno. For this reason, as well, Zavala's sentence should be vacated and remanded for resentencing.

**III.    STATEMENT REGARDING ADOPTION OF CO-APPELLANTS' ARGUMENTS.**

Federal Rule of Appellate Procedure 28(i) allows an appellant to adopt by reference the arguments of co-appellants. Zavala reserves the option to do so at

a later date. At the date of this filing, only one of the co-appellants has filed a brief. Zavala will, upon reviewing the briefs of all co-appellants, inform the Court in writing of which arguments he intends to adopt, if any, and how they apply to his particular case.

## CONCLUSION

FOR THESE REASONS, Zavala's conviction and sentence should be vacated and a new trial ordered. Alternatively, Zavala's sentence should be vacated and the case remanded for resentencing.

Respectfully submitted.

ADRIENNE URRUTIA WISENBERG
Wisenberg & Wisenberg, PLLC
1711 N Street N.W.
Second Floor
Washington, D.C. 20036
Telephone (202) 261-3649
Fax (202) 293-0701

*Attorney for Defendant-Appellant*

## CERTIFICATE OF SERVICE

I served one paper copy and one disk copy of the foregoing Brief on Johnny Sutton, U.S. Attorney for the Western District of Texas (Attn: Joseph H. Gay Jr., Assistant U.S. Attorney), by mailing them to his office at 601 N.W. Loop 410, Suite 600, San Antonio, Texas, 78216-5512 on July 31, 2006. On the same date, I served a paper copy and an electronic copy of this brief on counsel for the co-appellants at the following addresses:

Edward L. Bravenec
McKnight & Bravenec
721 S. Presa
San Antonio, Texas 78210

Vincent D. Callahan, III
226 E. Magnolia Avenue
San Antonio, Texas 78212

Bowen W. Sutton
Law Offices of Bowen W Sutton
115 E. Travis
San Antonio, Texas 78205

ADRIENNE URRUTIA WISENBERG

*Attorney for Defendant-Appellant*

## CERTIFICATE OF COMPLIANCE

Pursuant to 5th Circuit Rule 32.3.7(c), the undersigned certifies this brief complies with the type-volume limitations of 5th Circuit Rule 32.2.7(b).

1. Exclusive of the exempted portions in Fifth Circuit Rule 32.2.7(b)(3), the brief contains  6,052 words.

2. The brief has been prepared in a proportionally spaced typeface using Microsoft 2002; Word in Times New Roman 14 point.

3. If the Court so requests, the undersigned will provide an electronic version of the brief and/or a copy of the word or line print out.

4. The undersigned understands that a material misrepresentation in completing this certificate, or circumvention of the type-volume limits in 5th Circuit Rule 32.2.7, may result in the Court's striking the brief and imposing sanctions against the person signing the brief.

ADRIENNE URRUTIA WISENBERG

*Attorney for Defendant-Appellant*

31