# No. 05-51209

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

**UNITED STATES OF AMERICA,**

**Plaintiff-Appellee,**

**v.**

**JUAN VICTOR VALLES, a/k/a Smiley;**
**JOHNNY GARCIA-ESPARZA, a/k/a Gira;**
**SAMMY GARCIA, a/k/a Spiderman;**
**JIMMY ZAVALA, a/k/a Panson, a/k/a/ Gordo**

**Defendants-Appellants.**

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**

—————————

**BRIEF FOR THE UNITED STATES OF AMERICA**

—————————

|  |  |
|---|---|
|  | **JOHNNY SUTTON**<br>**United States Attorney** |
| **TRIAL ATTORNEYS**<br>**JOEY CONTRERAS**<br>**JOE SEPEDA**<br>**Assistant United States**<br>**Attorneys** | **ELLEN A. LOCKWOOD**<br>**Assistant United States Attorney**<br>**Western District of Texas**<br>**601 N.W. Loop 410, Suite 600**<br>**San Antonio, Texas 78216**<br>**(210) 384-7090 / FAX (210) 384-7031** |

**ATTORNEYS FOR APPELLEE**

## **RECOMMENDATION ON ORAL ARGUMENT**

The United States of America suggests oral argument would not significantly aid the decisional process in this case. The issues raised on this appeal can be determined upon the briefs that adequately present the record and legal arguments relevant to this appeal.  *See* FED. R. APP. P. 34(a)(2)(C).

## TABLE OF CONTENTS

**Pages**

RECOMMENDATION ON ORAL ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . ii

LIST OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE ISSUES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    A.  Course of Proceedings and Disposition in the Court Below  . . . . . . . . . 3
    B.  Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

SUMMARY OF THE ARGUMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

ARGUMENTS AND AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

    I.  EVIDENCE SUPPORTING JOHNNY GARCIA-ESPARZA'S
    CONVICTIONS ON ALL COUNTS WAS SUFFICIENT . . . . . . . . . . . 30

    II.  THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION
    WHEN IT DENIED APPELLANTS' MOTION FOR A MISTRIAL . . . . 47

    III.  APPELLANT FAILED TO SUFFICIENTLY ALLEGE
    TRIAL COUNSEL WAS INEFFECTIVE . . . . . . . . . . . . . . . . . . . . . . . 60

    IV.  APPELLANT DID NOT HAVE A RIGHT TO ENTER A PLEA
    IN FRONT OF THE JURY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

    V.  THE DISTRICT COURT DID NOT ERR IN SENTENCING
    JIMMY ZAVALA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

## TABLE OF CONTENTS CONTINUED

**Pages**

VI. THE DISTRICT COURT'S JUDICIAL FACT FINDING AT APPELLANT GARCIA-ESPARZA'S POST BOOKER SENTENCING DID NOT VIOLATE *BLAKELY* OR *APPRENDI* . . . . . . 74

VII. THE DISTRICT COURT DID NOT ERR IN FINDING APPELLANT SAMMY GARCIA WAS AN ORGANIZER OR LEADER EVEN THOUGH THE JURY DID NOT MAKE THIS FINDING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

VIII. THE DISTRICT COURT DID NOT ERR IN MAKING FACTUAL FINDINGS AT SENTENCING . . . . . . . . . . . . . . . . . . . . . . . 81

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82

## LIST OF AUTHORITIES

**Cases**                                                                              **Pages**

*Agostini v. Felton,*
     521 U.S. 203 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

*Apprendi v. New Jersey,*
     530 U.S. 466 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

*Burger v. Kemp,*
     483 U.S. 776 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

*Strickland v. Washington,*
     466 U.S. 668 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60, 61

*United States v. Alford,*
     142 F.3d 825 (5th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

*United States v. Ayala,*
     47 F.3d 688 (5th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

*United States v. Betancourt,*
     422 F.3d 240 (5th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

*United States v. Blakely,*
     542 U.S. 296 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74, 76

*United States v. Booker,*
     543 U.S. 220 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64, 66, 76, 81

*United States v. Brewster,*
     137 F.3d 853 (5th Cir.1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

*United States v. Cathey,*
     259 F.3d 365 (5th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66, 77

## LIST OF AUTHORITIES CONTINUED

**Cases**                                                                    **Pages**

*United States v. De Jesus Batres*,
    410 F.3d 154 (5th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

*United States v. Delgado*,
    256 F.3d 264 (5th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*United States v. Duncan*,
    400 F.3d 1297 (11th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . 65-67, 77

*United States v. Dupre*,
    117 F.3d 810 (5th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*United States v. Faubion*,
    19 F.3d 222 (5th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

*United States v. Faust*,
    456 F.3d 1342 (11th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66, 67

*United States v. Garcia-Mejia,*
    394 F.3d 396 (5th Cir. 2004),
    *overruled on other grounds*,
    545 U.S. 1102 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

*United States v. Magallanez*,
    408 F.3d 672 (10th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

*United States v. Mares*,
    402 F.3d 511 (5th Cir.),
    *cert. denied,* 126 S.Ct. 43 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . 75, 81

*United States v. Moreno*,
    185 F.3d 465 (5th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

## LIST OF AUTHORITIES CONTINUED

**Cases**                                                        **Pages**

*United States v. Navejar,*
    963 F.2d 732 (5th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

*United States v. Nguyen,*
    28 F.3d 477 (5th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*United States v. Parker,*
    133 F.3d 322 (5th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

*United States v. Partida,*
    385 F.3d 546 (5th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*United States v. Paul,*
    142 F.3d 836 (5th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47, 55

*United States v. Pimental,*
    367 F. Supp 143 (D. Mass. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

*United States v. Pineiro,*
    __F.3d. __, 2006 WL 3234353
    (5th Cir. Nov.9, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65, 77

*United States v. Pofahl,*
    990 F.3d 1456 (5th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

*United States v. Price,*
    418 F.3d 771 (7th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

*United States v. Radtke,*
    415 F.3d 826 (8th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

*United States v. Raymer,*
    876 F.2d 383 (5th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

## LIST OF AUTHORITIES CONTINUED

**Cases**                                                                                  **Pages**

*United States v. Richardson,*
    504 F.2d 357 (5th Cir. 1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

*United States v. Valdez*,
    453 F.3d 252 (5th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65, 76

*United States v. Vaughn*,
    430 F.3d 518 (2nd Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

*United States v. Wallace*,
    32 F.3d 921 (5th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55, 56

*United States v. Watts*,
    519 U.S. 148 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64-66, 77, 78

*United States v. Webster,*
    734 F.2d 1048 (5th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

**Statutes**

18 U.S.C. § 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 73

18 U.S.C. § 924 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 73, 80

18 U.S.C. § 1956 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 45, 73, 74, 74, 79

21 U.S.C. § 841 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 73

**Miscellaneous**

U.S.S.G. § 3B1.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74, 79

U.S.S.G. § 2S1.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74, 79

# No. 05-51209

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT
_____

## UNITED STATES OF AMERICA,

## Plaintiff-Appellee,

## v.

## JUAN VICTOR VALLES, a/k/a Smiley;
## JOHNNY GARCIA-ESPARZA, a/k/a Gira;
## SAMMY GARCIA, a/k/a Spiderman;
## JIMMY ZAVALA, a/k/a Panson, a/k/a/ Gordo

## Defendants-Appellants.

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
_____

## BRIEF FOR THE UNITED STATES OF AMERICA
_____

## <u>JURISDICTION</u>

This is an appeal from a final judgment of the district court in a criminal case.

The jurisdiction of this Court is invoked pursuant to 18 U.S.C. § 3742 and 28 U.S.C.

§ 1291.

**STATEMENT OF THE ISSUES**

I.  Whether the evidence against Appellant Garcia-Esparza was sufficient (Responsive to Garcia-Esparza's Issue I).

II.  Whether the district court abused its discretion when it denied defendants' motion for a mistrial after a government witness on cross examination displayed his gunshot wounds. (Responsive to Zavala Issue I, Garcia-Esparza Issue II, Sammy Garcia Issue I, and Juan Victor Valles Issue I).

III.  Whether this Court should consider Appellant Garcia-Esparza's claims of ineffective assistance of counsel for the first time on appeal (Responsive to Garcia-Esparza's Issue IV).

IV.  Whether Appellant Juan Valles had a right to plead guilty in front of a jury and whether Juan Valles ever sought to enter such a plea.

V.  Whether the district court clearly erred when it found at sentencing that Appellant Zavala was responsible for the murder of Luis Moreno. (Responsive to Zavala Issue II).

VI.  Whether the district court's sentence of Garcia-Esparza violated the Supreme Court's holdings in *Blakely* and *Apprendi*.

VII. Whether the district court erred in finding Appellant Sammy Garcia was an organizer for purposes of computing the advisory guideline range, despite the fact the jury declined to find Sammy Garcia was an organizer or leader.

VIII. Whether the district court erred in sentencing Appellant Valles for being a leader and organizer and for certain amounts of narcotics when there was no jury finding on the issue.

## STATEMENT OF THE CASE

### A. Course of Proceedings and Disposition in the Court Below.

**1. The indictment.**

On July 21, 2004, Appellants **Sammy Garcia**, a/k/a Spiderman, **Juan Victor Valles**, a/k/a Smiley, **Jimmy Zavala**, a/k/a Panson, a/k/a Gordo, and **Johnny Garcia Esparza**, a/k/a **Gira**, all members of the Texas Mexican Mafia and 24 other defendants were indicted by a federal grand jury in the San Antonio Division of the Western District of Texas (1 R. 1-2).[1] The indictment charged all 28 defendants with

---

[1]Because there are so many individuals involved in the conspiracies and the substantive counts, the names of Appellants are placed in bold in order to make it clear when the government is referring to an Appellant as opposed to other members of the conspiracy.

conspiracy to distribute and possess with intent to distribute a kilogram or more of heroin in violation of 21 U.S.C. § 841(a)(1), 841(b)(1)(A), and 846 (1 R. 8-9).[2]

The conspiracy count alleged that Appellants **Sammy Garcia**, **Valles, Zavala** and **Garcia-Esparza,** along with the 24 other defendants were members of the Texas Mexican Mafia during the course of the conspiracy or had actively assisted members of the Texas Mexican Mafia during the conspiracy. (1 R. 11). One of the primary functions of the Texas Mexican Mafia was the distribution of heroin and cocaine and controlling that drug trade by imposing a tax, "the ten percent," on non-member distributors. Overt acts included not only obtaining heroin and cocaine in large quantities and distributing the heroin and cocaine among members of the Texas Mexican Mafia for further distribution, but controlling the distribution of heroin and cocaine by restricting the trafficking to either members of the Texas Mexican Mafia or to non-members who paid extortion fees or what was also known as the ten percent tax to the Mafia. (1 R. 11). Other overt acts including protecting the authorized drug distributors from robbery, violence, and competition, and using violence to enforce the Texas Mexican Mafia requirement that all drug distributors pay the "tax" to the Mafia in exchange for the "privilege" of distributing narcotics (1 R. 11).

---

[2] The pleadings volumes are referred to as "R." preceded by the Volume number and followed by the page number. The trial transcript is referred to as "T." followed by the page number.

In addition to the Mexican Mafia drug conspiracy charge discussed above, Appellant **Juan Victor Valles** was charged with the following: distributing heroin and aiding and abetting in the distribution of heroin in violation of 21 U.S.C. § 841(a)(1) and 841(b)(10(C)(Count Thirteen); using, carrying, and possessing handguns in furtherance of a drug trafficking conspiracy in violation of 18 U.S.C. § 924(c) and 18 U.S. C. 2 (Count Thirty Two); and conspiracy to money launder in violation of 18 U.S.C. § 1956(a)(1)(A)(i)(Count Thirty Three).

Appellant **Sammy Garcia** was charged with the following offenses: the Mexican Mafia drug conspiracy discussed above (Count One); possessing heroin with intent to distribute in violation of 21 U.S.C. § 841(a)(1) and 841(b)(1)(C)(Count Twenty); and with the conspiracy to money launder in violation of 18 U.S.C. § 1956(a)(1)(A)(i)(Count Thirty Three).

Appellant **Jimmy Zavala** was charged in six counts: the Mexican Mafia drug conspiracy (Count One); possessing cocaine with intent to distribute in violation of 21 U.S.C. § 841(a)(1) and 841(b)(1)(B)(Count Twenty One); conspiracy to use, carry and possess a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c) and 18 U.S.C. § 2 (Count Thirty); using, carrying or possessing a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c) and 18 U.S.C. § 2 (Count Thirty One);  using, carrying or possessing a firearm in

5

furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c) and 18 U.S.C. § 2 (Count 32); conspiracy to money launder in violation of 18 U.S.C. § 1956(a)(1)(A)(i)(Count Thirty Three).

Appellant **Johnny Garcia Esparza**, in addition to the Mexican Mafia drug conspiracy in Count One was charged with seven other crimes: possessing heroin with intent to distribute in violation of 21 U.S.C. § 841(a)(1) and 841(b)(1)(B)(Counts Seventeen, Eighteen, Nineteen, and Twenty); conspiracy to use, carry, or possess firearms during and in relation to a drug trafficking crime in violation of 18 U.S.C. § 924(c) and 924(o)(Count Thirty); using, carrying or possessing a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c) and 18 U.S.C. § 2 (Count Thirty One); and conspiracy to money launder in violation of 18 U.S.C. § 1956(a)(1)(A)(i)(Count Thirty Three).

Counts Thirty and Thirty One, which alleged the possession or use of firearms during and in relation to and in furtherance of a drug trafficking crime or conspiracy involved the possession of an arsenal of fifty firearms, including pistols, semi-automatic pistols, assault rifles, and various shotguns (1 R. 15-19).

## 2. Notice of Relevant Sentencing Facts.

In addition to the Counts alleging violations of federal criminal law, the indictment included a "Notice of Relevant Sentencing Facts Found by the Grand

Jury." (1 R. 28). In the notice, the defendants were advised that the Conspiracy alleged in Count One, the Mexican Mafia drug conspiracy, involved one hundred and fifty (150) kilograms or more of cocaine and thirty (30) kilograms or more of heroin (1 R. 280. Appellants **Jimmy Zavala** and **Johnny Garcia-Esparza** were named as an organizer, leader, manager, and supervisor in a criminal activity that involved five or more persons or that was otherwise extensive. (1 R. 28-29). The government also advised that a man named Jose Luis Moreno was killed on July 9, 2002 under circumstances that constitute murder. The murder was an act in furtherance of the Mexican Mafia drug conspiracy alleged in Count One and was done either in preparation for the offense or in the course of attempting to avoid detection or responsibility for the offense (1 R. 28). Finally, the government advised that a dangerous weapon, including a firearm was possessed in the commission of an offense alleged in the indictment (id.).

### 3. Trial.

Appellants **Jimmy Zavala**, **Sammy Garcia**, **Juan Victor Valles**, and **Johnny Garcia-Esparza** pled not guilty. The jury was selected and trial began on April 4, 2005 (2 R. 208). The jury was sequestered (2 R. 210). On April 19, the jury was charged and sent to deliberate (2 R. 239, 297). On April 20, 2005, the jury returned its verdict finding all four Appellants guilty of each and every Count they were

charged with (2 R. 331-333). The jury also found that both Appellant **Jimmy Zavala** and **Johnny Garcia Esparza** were leaders or organizers of the conspiracy alleged in Count One (2 R. 331). The jury did not find that Sammy Garcia was a leader or organizer (2 R. 331). The jury found beyond a reasonable doubt that **Jimmy Zavala** committed a home invasion of Steven Pedraza on May 14, 2004 but declined to find beyond a reasonable doubt that **Jimmy Zavala** had intentionally and knowingly killed Jose Luis Moreno (2 R. 334). After the verdict was returned by the jury, appellant **Valles** made an oral motion for a new trial which was denied (2 R. 339).

### 4. Sentencing and Notice of Appeal.

Appellant **Jimmy Zavala** was sentenced on August 11, 2005 (2 R. 350, 358). He received life imprisonment on Count One; 480 months on Count Twenty One; and 240 months on each of Counts Thirty and Thirty Three (2 R. 358). The district court ordered that these sentences were to be served concurrently with each other (2 R. 358). The district court then sentenced **Appellant Zavala** to 60 months on Count Thirty One to be served consecutively to Counts One, Twenty One, Thirty, and Thirty Three. A sentence of 300 months on Count Thirty Two was imposed, to be served consecutively to Counts One, Twenty One, Thirty, Thirty One and Thirty Three. (2 R. 358). The court imposed a 5 years term of supervised release on each of Counts One, Twenty One, Thirty One, and Thirty Two, and 3 years on each of Counts Thirty

and Thirty Three, all to be served concurrently (2 R. 358). A special assessment of $600.00 was imposed and the fine was waived due to inability to pay (2 R. 358, 362).

On August 18, 2005, one of Appellant's attorneys moved to withdraw from the case indicating he had not been retained on appeal (2 R. 254). The other attorney also moved to withdraw on August 22, 2005, and at the same time gave notice of appeal (2 R. 356). The district court granted the first attorney's motion (2 R. 355). On August 23, 2005, the district court granted the second attorney's motion to withdraw and ordered that the Notice of Appeal was filed. The district court's Judgement was filed on August 25, 2005 therefore **Appellant Zavala's** notice of appeal was timely (2 R. 357).

Appellant **Johnny Garcia Esparza** was sentenced on September 14, 2005 to a total of 720 months imprisonment (4 R. 410, 413). This term of imprisonment consisted of 660 months on Count One, and 240 months imprisonment on each of Counts Seventeen, Eighteen, Nineteen, Twenty, Thirty, and Thirty Three to be served concurrently with each other and with count One, and 60 months on count Thirty One to run consecutive (4 R. 418). Five year terms of supervised release were imposed on each of counts One and Thirty One and five years of supervised release on each of counts Seventeen, Eighteen, Nineteen, Twenty, Thirty, and Thirty Three, to be served concurrently (4 R. 419). Because Appellant was convicted of eight felonies,

the court imposed a special assessment of $800 (4 R. 422). The fine was waived because of inability to pay (id.). A timely notice of appeal was filed on September 14, 2005 (4 R. 411).

The jury convicted Appellant **Juan Victor Valles** on four Counts (6 R. 319). On August 11, 2005, he was sentenced to a total term of imprisonment of 660 months (6 R. 320). It consisted of 600 months on Count One and 240 months on each of Counts Thirteen and Thirty Three, to be served concurrently with each other (id.). The court imposed a 60 month sentence on Count Thirty Two, the firearms charge, which ran consecutively to the sentence on the other counts (id.). Appellant **Valles** filed a timely notice of appeal (6 R. 310).

Appellant **Sammy Garcia**, who was convicted on four Counts, was sentenced on August 11, 2005 to a total of 660 months imprisonment (8 R. 314, 321). He received 600 months on Count One, 240 months on Counts Twenty and Thirty Three, to run concurrently (8 R. 321). The 60 month sentence on Count Thirty Two, the firearms charge, was to be served consecutively to the other sentences (8 R. 321). A timely notice of appeal was filed on August 17, 2005 (8 R. 316).

## B. Statement of Facts.

### 1. The organization.

The evidence at trial proved the following. The Texas Mexican Mafia, also known as "La Eme" or "Mexikanemi" was formed in 1984 by Heriberto Huerta (T. 197-199, 429; Govt. Ex. 5010). It began in the prisons but spread to major cities in Texas as members of the Mexican Mafia were released from prison (id.). The Texas Mexican Mafia has a military style organization. Although Huerta is now in prison, he is the President of the Texas Mexican Mafia (T. 199-200). Benito Alonzo, who is also in prison, was vice president (T. 200-202, 429; 16 R. 1092-94, 1092; Govt. Ex. 5010). Benito Alonzo ran the gang in the Texas Department of Corrections; Reynaldo Ramirez runs the gang in the federal penitentiaries (id.). Within the prisons, there are gang members who hold the ranks of captain, sergeant, and lieutenant (T. 202). When members are released from prison, they surrender their prison rank when they come out (T. 204, 1096).

Outside of prison, there is a similar structure with a statewide general, a general in charge of San Antonio, lieutenants in charge of each section of the city who are assisted by sergeants and third men. (T. 1208-09, 1217, 1277, 1406). When a member of the Mexican Mafia leaves prison, he is required to report to the leaders of the Mafia on the outside (T.246, 1368, 2022, 2215).

Most members of the Mexican Mafia join the gang while they are in prison (T. 1229-30). Some are permitted to join before they go to prison (T. 1229). Typically, in order to prove themselves they are required to murder someone, an act which is referred to as a cameo in order to gain membership. In order to become a member of the Mafia, a person must be sponsored by a patron, a padrino (T. 738-39).

San Antonio is the capital of the Mexican Mafia; the gang also operates in major cities such as Houston, Dallas, Midland, Odessa and El Paso and all over the state of Texas (T. 205-207). Outside of prison, there are members of the Mexican Mafia that have rank and are in charge (T. 206-207). In each city there is usually a general, then a captain and lieutenants and sergeants (T. 206). Members without rank are called soldiers and all members of the Mexican Mafia refer to each other as "carnales" a term which indicates membership in the gang (T. 206, 215). Certain tattoos are commonly used by members of the Mexican Mafia (T. 218-246).

When a member is released from prison, a letter is sent to the Mafia on the outside, which confirms that the person is in good standing in the Mafia (13 R. 248. 1097).

One of the Mafia's purposes outside of prison was to raise money for its members who were in prison. It raised this money by trafficking in drugs and by extorting a street tax from drug dealers and others. (T. 267). The street tax is known as the

12

"dime" or the "10%" (T. 267). Some of the money raised from this extortion was used to purchase money orders that were sent to prison trust accounts belonging to members of the Mexican Mafia (T. 277-78). The year before the trial, the President of the Mexican Mafia, Herb Huerta, had more than $8,000 in his prison account (T. 278). Evidence obtained from the execution of search warrants documented thousands of dollars going to Huerta and others in prison (T. 278, 282).

The constitution made it clear the Mexican Mafia was a criminal organization. It stated, "In being a criminal organization, we function in whatever aspect or criminal interest for the benefit of advancement of Mexikanemi. **We will traffic in drugs, contract murders, prostitution, major robberies, gambling, arms and anything we can imagine**." (T. 265-66)(emphasis added). Witnesses at trial confirmed the business of the Mafia was "drugs, prostitution, gambling, murder, anything and everything." (T. 757).

The Mafia is a violent organization. If a person is believed by the Mexican Mafia to be a traitor or a snitch, the person who sponsored that person into the Mexican Mafia is obliged to kill him (T. 261-263). A "green light," which is an order to kill is issued (15. R. 738). Several witnesses at trial testified that a green light had been placed on them because they were testifying for the government (T. 738-39, 741, 746). If a person refuses to pay the tax or can't, the Mafia will do a home invasion

13

and take everything including vehicles (T. 270-71).  Refusal to pay can result in the person being killed (T. 271).  Certain persons in the organization hold the weapons for the others (T. 272).  The cache of weapons the Mafia had in San Antonio included fifty .22s, .45s, AK-47s and other assault weapons (id.)   If the Mafia is going to do a home invasion, firearms are obtained from the person who is responsible for holding them; release of the weapons is authorized by lieutenants or above (id.).  When the weapons are returned to that person they are either discarded, destroyed or hidden in a different location where they can't be found (id.).

## 2.  Texas Mexican Mafia Leadership

The evidence at trial established that during the time covered by the indictment in this case, Daniel Leza a/k/a Gumby became the Vice President of the Mafia in charge of San Antonio. (T. 430; T. 800-02).  Carlos Rodriguez, who had been Vice President, was pushed aside and later assassinated (id.).  Appellant **Jimmy Zavala** was the Mexican Mafia general in charge of San Antonio ( T. 589, 573, 1108-09).  According to the Mexican Mafia constitution, a general is "responsible for all that happens in the region of which they are in charge." (T. 257).  The general also has the obligation of maintaining communication with the president and vice president (id.).  Before becoming the general, **Jimmy Zavala** was the captain (1217).  The captain was above the 4 San Antonio lieutenants and oversaw everything concerning money

14

and drugs and he controlled the lieutenants (T. 1217-18).  Even when **Jimmy Zavala** was a lieutenant, an insider testified that **Zavala** was really running things (T. 1221-22). As a general, **Appellant Zavala** was the one who ordered someone in the Mafia be killed.  He issued the "green lights" or orders to kill Tony Rodriguez and **Appellant Juan Victor Valles** (T. 1111-1117).  Testimony at trial proved **Zavala** murdered Luis Moreno. (T. 2526-2541, 2605-2636). **Zavala** oversaw and personally participated in extorting the 10% tax, (1155-1172, 2030-32). Jesse "Chuy" Rodriguez was the captain under **Jimmy Zavala** (1222-23).

The city of San Antonio is divided by the Mexican Mafia into four sections, north, south, east and west (T. 248).  These sections are referred to as "eschenas" or corners (T. 266). The highest ranking person in charge of a corner is a lieutenant (T. 433).  Michael Rios, a/k/a Changito, a government witness, was a lieutenant who was in charge of all of the other lieutenants and was in charge of the  west side (T. 394, 432).  Rios and the other lieutenants took orders from **Jimmy Zavala**  who was the general in San Antonio (T. 421; T. 805, 1230).  Appellant **Juan Garcia-Esparza a/k/a Johnny Garcia a/k/a Gira** was the lieutenant on the northside (T. 432, 1224). The sergeant for the northside was Juan Valdez a/k/a "Fly" and the third man, a man who assisted the sergeant was **Appellant Sammy Garcia a/k/a Spiderman.** (T. 1399, 1406).  Cleto Rodriguez was the lieutenant on the south side of San Antonio

(T. 432). Appellant **Juan Victor Valles a/k/a Smiley** was the lieutenant on the east side until Santos Yanez a/k/a Puppet took over (T. 433, 1224, 1226).

Appellant **Juan Victor Valles** a/k/a Smilie was initially a sergeant in the Mexican Mafia (T. 1045). He was promoted to lieutenant of the East side (1045, 1225). **Valles** was involved in collecting the 10% (T. 1045). He was also heavily involved in the distribution of cocaine and heroin (T. 1692, 2069). **Valles** ultimately lost his rank. He was in charge of collecting the 10% on the East side but he didn't collect enough money and he was replaced by someone else (T. 1225-26). **Valles** name was included in an address book found at Juan Valdez's apartment with names of other Mexican Mafia members (T. 1622; Govt. Ex. 3210a). The Mexican Mafia constitution provided that "lieutenants are responsible for the towns where they are from or from any ranch, prison." Lieutenants are to "maintain a close communication with the generals."(T. 258; Govt. Ex. 312a). A government witness, who was a lieutenant for the Mafia said that a lieutenant sends the soldiers and the sergeants to do what has to be done (T. 1213). The lieutenant directs people (T. 1214).

The term "mesa" was used by the Mafia to describe the leadership (T. 1228). The "mesa," which included those with the rank of lieutenant or above, met whenever they needed to, but at least once a week (1228-29).

### 3. Heroin and cocaine trafficking.

A number of individuals supplied drugs to the Mafia, Hortencia Flores a/k/a Tencha, Roger Flores a/k/a Boli, and Johnny Ybarra a/k/a Johnny Green Eyes. The person in the Mafia in San Antonio in charge of corresponding with Mafia inmates was Robert Perez a/k/a Joker (T. 431, 885, 1391, 1413-14).

During the time covered by the indictment, the Mexican Mafia sought to increase its involvement in drug dealing and increase its sources of supply (T. 760-85). To accomplish this they moved in on others who had sources, forcing them to share the heroin and cocaine received from Mexico (T. 760-767, 770-771). As a result the Mafia became more involved in heroin and cocaine trafficking and the amount they received increased dramatically (T. 783-84, 764-65, 856-59, 866-867, 888-890; Govt. Ex. 703). Between 1998 and 2004, the Mafia imported and distributed huge amounts of cocaine and heroin. One witness testified the Mafia was moving at least a kilo of heroin a week and he knew 10 carnales who were moving that much (1105). One to 2 kilos of cocaine a week were being moved (id.)

The drugs were received by the higher ranking individuals in the Mafia (1000). They would get it and distribute it to all of the lieutenants (id.). The lieutenants distributed it to the sergeants and the sergeants then distributed it to the soldiers (id.).

17

**Appellant Jimmy Zavala** was in charge of obtaining and redistributing the cocaine for the Mafia (T.1230, 33, 1381-83, Call 59). Zavala received kilo quantities of cocaine every week; sometimes he got two kilos a week (T. 1234). He received the cocaine and divided it among the lieutenants giving them nine ounces a week to sell (T. 1230). **Appellant Sammy Garcia's** role in the cocaine trade was to take the kilo of cocaine and break it down into ounces (T.1238-39). Soldiers could not purchase cocaine from **Zavala**. They had to go through the lieutenant (T. 1238). **Appellant Johnny Garcia Esparza** was responsible for obtaining the heroin and distributing it to lieutenants of the Mafia for further distribution (T. 1240, 1389, 1393-1406, 1413, Calls 473, 117, 31, 57, 440). Approximately one kilogram of heroin was obtained per week and divided among the 4 corners of San Antonio so that each lieutenant in a corner received 9 ounces. **Appellant Johnny Garcia Esparza** also dealt in cocaine (T. 1249; Call 41).

In addition to dividing and packaging the cocaine, **Appellant Sammy Garcia** was a heroin runner, delivering the heroin to those who "ordered" it from **Appellant Johnny Garcia Esparza** (1393-1406, 1413, Calls 473, 117, 31, 57, 440). A soldier who wanted to obtain heroin to sell would have to get it from his lieutenant. Members with rank could be fronted heroin; others were required to purchase it (T.

18

784). Members coming out of prison were given an ounce of heroin to get them started in drug distribution (1232). The drugs came from the organization (id.).

Johnny Ybarra, a Mexican Mafia member who testified at the trial, was a major supplier of heroin and cocaine for the Mafia. He testified at trial that, in addition to supplying **Johnny Garcia-Esparza** with heroin and cocaine, he supplied **Valles** and another Mafia member with kilo quantities of cocaine and with heroin (T. 1692, 2069). Another member of the Mexican Mafia testified he obtained ounces of cocaine from **Appellant Valles** on several occasions (id.). **Valles** fronted some of the cocaine. The witness explained that cocaine trafficking was Mexican Mafia business (T. 1047).

The money from the drug sales in San Antonio "went straight to the top" and from there a portion was distributed to the penitentiaries where the money went for the needs of the Mafia members in prison (T. 772-773, 1263-65, 1317-1319, 1347-1350).[3]

---

[3] On March 24, 2004, there was a meeting at the Penthouse and the purpose was to see what was going on in the federal prisons (1416). **Appellants Jimmy Zavala** and **Johnny Garcia-Esparza** were there with other Mafia leaders (Gx. 134). There had been a lot of confusion and they were going to put someone in charge (1416). There was also a meeting at a place called Legends and it was for the purpose of collecting money to send to Herb Huerta, the President of the Mexican Mafia who is in prison (1421). According to one witness, Huerta was receiving $10,000 every two weeks (1421).

During the course of the conspiracy, there were thirty one seizures of heroin, cocaine and weapons from members of the Mexican Mafia and those individuals working with the Mafia in the conspiracy.  See Govt. Ex. 236, 402, 703, 1144, 1145, 1605, 1725, 1806, 2001, 2002, 4003 (seizures of heroin) and Govt. Ex. 1604 (seizure of cocaine).

### 4.  Extortion.

The Mafia, its members and Appellants were not only responsible for heroin and cocaine distribution.  They controlled the distribution of the drugs by restricting the trafficking to those who paid the 10% tax (1202-1205).  They also protected the dealers who paid the tax from competition from other dealers and they provide protection to the dealers from people that might rob them (1330).

Witness Leroy Barron testified he was visited in October, 2002 by **Jimmy Zavala** who came to his home and told Barron he was representing "La Eme," the Mexican Mafia (T.1154-55).  There were three men there including **Zavala** (T.1155-56).  Even though Barron insisted he was no longer selling drugs, **Zavala** demanded $50,000 (T. 1157).  There were repeated visits and threats (T.1155-1171; Govt. Ex. 1201, 1202, 1206, 1207).

Michael Rios, the lieutenant for the west side of San Antonio, testified that he collected the 10% in the west part of San Antonio for the Mafia when he was a soldier

20

and continued to do so as he was promoted to lieutenant (T. 1194, 1201-1203). He explained that non-payment resulted in a home invasion usually carried out by soldiers and sergeants who kick the door down (1206). The Mafia charged $100 in tax for each ounce of heroin sold by the dealer (1216). Rios collected about $6,000 a week on the west side (1216). He turned the money over to a higher ranking person in the Mafia, **Jimmy Zavala** who was a captain at the time (1216-1217). He would meet **Zavala** at different places to transfer the money to him (1218-19). Whoever collected the 10% got to keep 25% of the amount collected (1220). All of the corners of San Antonio together collected about $15,000 a week after the 25% cut was taken out (1228-29).

Even after members of the Mafia were arrested and indicted, **Jimmy Zavala** was extorting the tax from behind bars. Israel Soto was in jail on drug charges at the same time **Jimmy Zavala** and other Mexican Mafia members were in jail on the current charges. **Zavala, Valles** and **Sammy Garcia** had met with Soto to collect the tax before they were all arrested (T. 2365-2367). **Zavala** told Soto that he owed about a quarter of a million dollars because he had been pushing a lot of drugs on the street. Soto explained he did not have that kind of money (id.). They took one of his friend's hostage and would not release him until Soto paid them $5000 (id.). Then

21

when they were all in jail, **Zavala** demanded payment and Soto's wife turned over $5000 to one of **Jimmy Zavala's** friends (T. 2363).

**5. Deaths and Murders and Green Lights.**

A number of people died during the course of the charged conspiracy. The individual who purchased drugs from **Appellant Juan Victor Valles**, Mercy Brooks, was shot twice in the head on September 18, 2004, after the indictments were returned in this case, but before trial (T. 928-929, 937-938, 976). While in jail, **Appellant Valles** told a government witness that Mercy Brooks was snitching on him. **Valles** said he had sold some heroin to Mercy Brooks and that was why he was in jail (1118-1119).

On September 2, 2003, Luis Adames, Jr. was shot twice after arriving at his residence. Adame survived and testified at trial. He testified that there was a "green light" on him and that the person who was to take him out was **Appellant Juan Valles**. Adame testified that **Valles** got out of his vehicle and shot him. He explained that the green light was ordered because he told them he was quitting the Mexican Mafia. All of Adame's testimony was striken by the district court because the witness showed the jury his scars.

Jose Luis Moreno's remains were found on October 15, 2003 (T. 2531). They found bones, a jaw, a man's watch, a baseball cap and jewelry (T. 2531-2540).

Testimony at trial, which is discussed in detail below, proved **Jimmy Zavala** was responsible for Moreno's murder. The night Moreno disappeared, **Jimmy Zavala** gave a gun to the person in the Mafia responsible for destroying weapons that have been used (T. 2605-2615). It is the custom in the Mafia that the person who delivers the weapon to be destroyed is the person that used it (id.). Moreno's vehicle, which was streaked with bloody handprints, was torched that night as well (id.). After Moreno's murder, **Jimmy Zavala** became a member of the Mafia and took Moreno's position as lieutenant (T. 2617-2619).

Henry Cantu was shot several times at close range in the head and body on December 9, 2002 (T. 1479, 1480). When he was taken to the hospital, they found a note in Cantu's possession that said "payment to **Jimmy** $500." As discussed in detail below, Cantu received a call from **Zavala** the day he died.

At trial, William Covarrubias testified that **Appellant Jimmy Zavala** ordered him to "take care of" or to kill **Appellant Juan Victor Valles**. The witness went to look for **Valles** but did not find him (1113-1117). Mexican Mafia member Carlos Lopez told the jury that there was a meeting of the Mexican Mafia in April, 2004 at Smith's Barbeque in which they planned to kill **Appellant Juan Valles**.(2096-98). They were going to kill **Valles** because they thought he was working with the feds (id.). The witness explained they had done a home invasion, gotten busted and the

charges were later dropped (id.). Also, **Valles** had been pulled over and found with weapons (id.). Even though **Valles'** father took the blame, the Mafia believed he was working with the feds (id.). For that reason, the Mafia leadership believed **Valles** was a traitor. (2096-98).

At a meeting attended by Appellant **Jimmy Zavala**, witness William Covarrubius, and others, they discussed killing another Mexican Mafia member Tony Rodriguez (1110). Chuy Rodriguez brought the issue up with **Appellant Zavala** and they talked about killing Tony Rodriguez because Tony was upset about his brother Carlos Rodriguez's murder (id.). Carlos Rodriguez had been the vice president before Daniel Leza, "Gumby" (id.). **Appellant Jimmy Zavala** gave Covarrubius the assignment to kill Tony but Covarrubius did not carry it out because he could never find Tony (1111-1113). Tony Rodriguez was dead at the time of the trial in this case (1215-16).

Witness Henry Rodriguez testified that a green light had been placed on him for testifying at the trial (T. 738-39). He told the jury that a green light had been placed on Joe Sandoval a/k/a Yogi, who was the lieutenant on the west side (T. 741, 746). Witness Daniel Flores, a member of the Mexican Mafia testified that when he got out of prison he quit the Mexican Mafia. He explained that you are not able to

24

"quit" the Mexican Mafia (T. 1038-40).  There is a "green light," a "death warrant" on him that he got when he quit the Mafia (T. 1038-40).

**6.  Home invasions.**

If a person didn't pay the tax or the 10%, the Mafia would go in and take all of their possession and drugs. (1204). William Covarrubias testified that in March, 2004, there was a man who owed back taxes.  When they went to his bar to collect and he said he didn't have the money, they were going to take him and put him in his truck and take him to where ever he had the money (1100-02).  They were armed.  As they were putting him in the truck, he told them he had something (1102).  He popped open his SUV and they took two duffle bags that had about 90 lbs. of marijuana (1102, 03).

An intercepted phone call proved **Jimmy Zavala** on April 7, 2004,  had sent two soldiers to "jack" a person selling drugs and not paying the tax (T.1380, Call 60). They took $100 and 14 balloons of heroin (id.)

On May 14, 2003, officers received a report of a burglary in progress ( T.  911, 2394-2421). Steve Pedraza's wife called the police, 911, saying there were men outside her apartment and they would not let her close the door (T. 2393-94). The residents, Steve Pedraza, his wife and his baby, had barricaded themselves in a bedroom (id.). Pedraza testified that he sold small amounts of cocaine, that he knew

about the 10%, but had not paid it (T. 2391-92)).  When police arrived at the address they saw **Appellant Jimmy Zavala** go inside the apartment (T. 2425).   Santos Yanez was outside (id.). Appellant Juan Victor **Valles**, and Appellant **Sammy Garcia** were in the doorway of the apartment (T. 2420-2427, 2437). When searching the apartment, officers found a Taurus .9mm semiautomatic handgun. (T. 2442-2443). It was in a Sonic bag shoved behind the refrigerator (id.).  Pedraza testified the weapon did not belong to him (T. 2400-01).

### 7.  Weapons.

A government witness testified that the Mafia had weapons which included handguns and assault rifles.  It was a secret where the weapons were kept.  The high ranking officers of the Mexican Mafia knew the location.  If a soldier was collecting the 10% or was going to do a "kick door," the Mafia would provide him with a weapon  (1104-1105).  During a search, officer found a cache of approximately 50 firearms.  One of the weapons found was reported stolen from a police officers house (T. 1928).  Some of the assault rifles were loaded and some of the weapons were loaded with hollow point bullets (id.).

### SUMMARY OF THE ARGUMENTS

I.  Because Appellant **Johnny Garcia Esparza** did not move for a judgement of acquittal at any time, his sufficiency claim is reversed only if affirmance would

lead to a manifest miscarriage of justice. The evidence of **Garcia-Esparza's** guilt is sufficient under any standard. Appellant was a high ranking officer, a lieutenant in the Mexican Mafia. Witnesses testified he was in charge of obtaining and distributing heroin in the Mafia and that he was involved in collecting the 10% tax which was used to support the organization, its members in and out of jail and to purchase additional drugs. It is clear there were conspiracies to possess cocaine and heroin with intent to distribute and to launder money. Appellant was a member of those conspiracies. There is also ample evidence proving the four substantive drug counts. Witnesses testified that as part of the extortion scheme, Appellant was forcing a business owner to sell heroin out of his bar. The transfers of heroin were documented by tapes, surveillance, and the heroin itself, in addition to witness testimony. Finally, the evidence supports the firearms charges. A cache of 50 weapons was found. Testimony established the firearms belonged to the Mafia and that Appellant had control of the weapons and who used them. Several times he requested weapons be supplied to his soldiers to be used while collecting the 10% or conducting a home invasion. The evidence presented at trial supports the jury's verdict.

II. A government witness's display of his scars in the courtroom during cross examination was not overly prejudicial. If there was prejudice, it was cured by the

district court's actions in striking the witness's testimony and telling the jury to disregard it. The fact the district court repeated its instruction and told the jury not to consider it prior to deliberations rendered the action harmless. The action by the witness occurred on cross examination and it was arguably invited by Appellant **Valles** counsel who seemed to be trying to get the witness to lose control. In any event, because the evidence against Appellants was overwhelming any error was harmless and the district court did not abuse its discretion when it denied Appellants' motion for a mistrial.

III. Appellant **Garcia-Esparza** fails to specify how his trial counsel was ineffective at sentencing. He does specify counsel was ineffective by failing to object to a witness's testimony. Other counsel objected to a portion of the witness's testimony and moved for a mistrial. The district court considered the motion for a mistrial to be from all of the defendants and denied it. Appellant therefore cannot show prejudice. Moreover, the record is not sufficiently developed on the issues to permit consideration of the issue for the first time on appeal.

IV. Appellant **Valles** fails to provide any authority that supports his contention he should have been permitted to enter his plea in front of the jury. Indeed, this Court has indicated that such a procedure is fraught with potential problems.

V. The district court did not err in finding Appellant **Jimmy Zavala** murdered Jose Luis Moreno and considering that factor sentencing. Even though the jury declined to find **Appellant Zavala** committed the murder beyond a reasonable doubt, the district court could find by a preponderance of the evidence that Appellant had murdered Moreno. The Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005) did not overrule the Supreme Court's decision in *United States v. Watts*, 519 U.S. 148 (1997). In the alternative, applying the murder guideline was harmless since Appellant would have received a life sentence even if that guideline were not applied.

VI. **Appellant Garcia-Esparza's** sentence did not violate *United States v. Blakely*, 542 U.S. 296 (2004) or *Apprendi v. New Jersey*, 530 U.S. 466 (2000). When a defendant is sentenced under an advisory guideline scheme, the Sixth Amendment does not prevent the district court from making factual findings relevant to sentencing.

VII. The district court did not err in finding **Appellant Sammy Garcia** was a leader or organizer even though the jury declined to find beyond a reasonable doubt that he was. As set forth above, a district court may use acquitted conduct at sentencing so long as the sentence does not exceed the sentence authorized by the

jury's verdict. In any event, the increase of Appellant Sammy Garcia's offense level by two levels did not affect his sentence. Therefore, any error was harmless.

VIII. **Appellant Valle's** sentence did not violate *United States v. Blakely*, 542 U.S. 296 (2004) or *Apprendi v. New Jersey*, 530 U.S. 466 (2000). When a defendant is sentenced under an advisory guideline scheme, the Sixth Amendment does not prevent the district court from making factual findings relevant to sentencing.

## <u>ARGUMENTS AND AUTHORITIES</u>

### I.  EVIDENCE SUPPORTING JOHNNY GARCIA-ESPARZA'S CONVICTIONS ON ALL COUNTS WAS SUFFICIENT

Appellant **Johnny Garcia Esparza a/k/a Johnny Garcia a/k/a "Gira"** argues that the guilty verdict was based on factually insufficient evidence. Therefore, he submits his convictions should be reversed (Appellant Johnny Garcia-Esparza's brief at 2). Appellant does not specify which count or counts he seeks to have reversed based on insufficient evidence.

Because Appellant Garcia Esparza did not move for a judgement of acquittal at any time during the trial, this Court's review of the evidence is very limited. This Court may set aside the conviction only if it's affirmance would result in a "miscarriage of justice." *United States v. Partida,* 385 F.3d 546 (5th Cir. 2004). Under this standard, Appellant's conviction may be reversed only if "the record is

devoid of evidence pointing to guilt." *United States v. Delgado*, 256 F.3d 264, 274 (5th Cir. 2001). As discussed below, the record certainly is not devoid of evidence proving Appellant **Garcia Esparza**'s guilt. Rather, the evidence against Appellant is abundant proving Appellant's guilt under any standard.

The evidence was more than sufficient to prove that Appellant **Johnny Garcia-Esparza a/k/a "Gira"** was guilty of the crimes he was charged with in the indictment.[4] Appellant **Johnny Garcia Esparza**, was charged with the Mexican Mafia drug conspiracy in Count One; four counts of possessing heroin with intent to distribute in violation of 21 U.S.C. § 841(a)(1) and 841(b)(1)(B)on or about March 17, 2004(Count Seventeen), on or about March 24, 2004 (Count Eighteen) on or about March 30, 2004 (Count Nineteen) and on or about April 22, 2004 (Count Twenty); conspiracy to use, carry, or possess firearms during and in relation to a drug trafficking crime in violation of 18 U.S.C. § 924(c) and 924(o) on or about August 1, 1999 (Count Thirty); and using, carrying or possessing a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c) and 18 U.S.C. § 2 on or about April 29, 2004 (Count Thirty One); and conspiracy to money launder in

---

[4] Testimony established **Garcia Esparza's** nickname was "**Gira**." (R. 593, 1224).

violation of 18 U.S.C. § 1956(a)(1)(A)(I) on or about August 1, 1999 until on or about August 1, 2004(Count Thirty Three).

## A. Count One- The Mexican Mafia drug conspiracy.

The government proved the Mexican Mafia drug conspiracy charged in Count One beyond a reasonable doubt. The government also proved Appellant **Johnny Garcia Esparza** was a member of that conspiracy. Witnesses testified that **Appellant Johnny Garcia Esparza** was a lieutenant in the Mexican Mafia with an important role in Mafia leadership (T. 432, 613, 1223-24). **Garcia-Esparza's** membership in the Mexican Mafia is confirmed by the tattoos on his body that say Mexikanemi or depict Aztec warriors, tattoos commonly used by the Mexican Mafia (13 R. 355-357; GX 6-10). Phone and wiretap records documented continuous communication between Appellant **Garcia-Esparza** and other known members and leaders of the Mexican Mafia (13 R. 374-381 411-413; Govt. Ex. 5001-5005). Appellant **Garcia Esparza** was also present at important meetings where Mafia business such as drug trafficking proceeds and status reports from each corner were discussed ( T. 613, 122-1228, 1414-1415, 1416, 1606-07, 1632, 1658, 1660-1663; Govt. Ex. 1105; Govt. Ex. 102). As a lieutenant, he was part of the leadership of the Mafia and therefore in charge of the Mafia's business which was to deal in drugs, murder, prostitution, and robberies (T. 265-266, Govt. Ex. 312(a) and (b)).

Documents found during a search of a Mexican Mafia member's home, list "**Gira**" (**Appellant Johnny Garcia Esparza)** in a document that included a number of individuals who were members of the Mafia or provided drugs to the Mafia (Govt. Ex. 308; T. 505-512).  A substantial amount of cash, $8,360.00 found in Appellant's home during the execution of a search warrant also supports the jury's conclusion that **Appellant Garcia-Esparza** was trafficking in heroin (Govt. Ex. 1918).  A drug sale ledger recovered from the home of Jesse Chuy Ramirez, another Mexican Mafia lieutenant, shows cash going to "Gira" (**Appellant Garcia-Esparza**).

Witnesses confirmed that the Texas Mexican Mafia was involved in drugs, prostitution, gambling, murder and "anything and everything."  (T. 571, 626, 757, 1047, 1097-98.  They also described a system whereby the Mexican Mafia "taxed" others who sold drugs, thereby assuring the Mafia got a percentage of all of the illegal drugs trafficked in areas they controlled. (T. 571-572, 1205, 1208, 1216, 1390-91). The tax was enforced by violence if necessary. ( T. 570-571, 575-582). If a person did not pay the taxes, Mafia members in an operation called a "kick door" or a "home invasion," would  arrive armed and take  drugs and anything else of value the person possessed. (T. 1102-1103, 1203-05; 1380, Call 60).  The money obtained from the tax was substantial.  A former Mexican Mafia lieutenant testifying for the government

told the jury that he collected about $15,000 in tax in his section of the city per week (T.1227). This was after their cut was taken out (T. 1228).

In 1999, the Mafia decided it was missing out on making money from heroin (T. 757-758). A lot of outsiders were making more money than Mafia members "carnales" (T. 757). There were a series of meetings at which the Mafia leadership decided it needed a bigger piece of the action (T. 758-759). Ultimately the Mafia demanded half of the black tar heroin being supplied to the Flores sisters from Mexico (T. 761-763, 766-767, 770, 782). The heroin was being brought in from Mexico in hollowed out shoes (764-765, 858-859; Govt. Ex. 703). About 10-15 ounces would fit in a shoe and each girl bringing the shoes across would bring in two to three shoes ( 765). Sometimes runners were sent to Mexico to pick up the shoes (T. 870). The heroin flow from this Mexican supplier they shared with the Flores sisters was 20 ounces of pure black tar heroin every week or two (T. 774-75, 860-862). Then things got really sophisticated and they started bringing it across the border in 18 wheelers, putting the heroin in the shocks. (T. 775). The heroin distribution by the Mafia became more sophisticated and organized and by 1999 the Mafia had a steady flow of heroin (T. 778-779). Once the heroin arrived in San Antonio, it was cut and processed into street heroin (T. 783). After processing,

twenty ounces of pure heroin was mixed with lactose and turned into 60 to 80 ounces of street heroin (T. 783; 861-62).

The higher ranking individuals in the Mafia got the heroin and distributed it to the lieutenants, who in turn distribute to the sergeants and to the soldiers (T. 1100, 1218). One Mexican Mafia member who was released from prison testified that once he got out of prison in 2003, the Mafia gave him an ounce of heroin a week to sell and he could get as much heroin as he could sell (T. 1101). The heroin was sold to carnales at a good price or fronted to them (T. 1097-98, 784-86, 1101). Huge amounts of heroin were being moved by the Mafia. One witness testified they were moving at least a kilo of heroin a week and he knew of 10 other carnales that were moving that much. (T. 1105) One to two kilos of cocaine a week were being moved (T. 1105).

It is clear from the evidence presented at trial that **Appellant Garcia Esparza** "Gira" was heavily involved in heroin trafficking for the Mexican Mafia. He was an officer in the Mexican Mafia, a lieutenant in charge of Mafia operations on the north side of San Antonio (T.1223). He was part of the Mexican Mafia leadership (T. 1223-1225). He was involved in trafficking both heroin and cocaine.

Ricardo Saenz, a Mexican Mafia member, testified that the Mexican Mafia distributed marijuana, cocaine and heroin (T. 571). Saenz obtained heroin by

ordering it from **Appellant Garcia Esparza** and it was delivered by **Sammy Garcia** (T. 595). He got about an ounce of black tar heroin (pure heroin) every week from **Sammy Garcia** but he had to order it from **Garcia Esparza** (T. 593). He started dealing with **Garcia Esparza** and Sammy Garcia in 2003 and he got an ounce a week (T. 592-593). Sometimes he got more. He distributed the heroin to the dealers in his corner (T. 590, 596). Those dealers paid the tax back to the Mafia (T. 596-97, 626).

Michael Rios, who was a lieutenant for the west side, testified for the government at trial. He told the jury that the heroin sold by the Mafia was supplied by **Gira, Appellant Garcia Esparza,** and that **Garcia Esparza** was in charge of the heroin for the Texas Mexican Mafia (T.1240, 1413). One of Gira's source was Johnny Ybarra a/k/a Johnny Green Eyes (id.). **Gira** (**Appellant Garcia-Esparza)** was getting about a kilo a week (T. 1240-41).

Johnny Ybarra testified that he negotiated a deal with **Garcia Esparza** in 2003. Ybarra ran into **Garcia-Esparza** at a Texaco station (T.1684). The mesa (the Mexican Mafia leadership) was looking for some cocaine and heroin (T.1684-85). Ybarra and **Garcia Esparza** discussed getting black tar heroin. (T.1683-1685). After the conversation, Johnny Ybarra started supplying **Garcia-Esparza** with black tar, pure heroin, 10 ounces at a time (T. 1686-1688). He also arranged a connection so that cocaine could be purchased in kilo quantities (T. 1685-86).

Carlos Lopez also told the jury that the Mexican Mafia was heavily involved in the drug and coke business. (T. 2043, 2044). The house (referring to the Mexican Mafia) would supply pure heroin to its members (T. 602,2043, 2044, ).  According to Lopez's testimony, **Appellant Garcia-Esparza** had the heroin (T. 2044-2047). If a soldier in the Mafia wanted an ounce, the lieutenant the soldier reported to would call and ask **Garcia-Esparza** for it. (id.).  **Appellant Garcia Esparza** controlled it but did not hold it. (id.).  **Garcia Esparza** would call Sammy Garcia and then instruct the lieutenant making the request to contact Sammy Garcia to set up a meeting place. (id.).  Lopez stated that he bought a lot of heroin from **Garcia-Esparza** and **Sammy Garcia** delivered it. (id.).  Lopez bought an ounce or an ounce and a half a week. (id.).

**Appellant Garcia-Esparza** was also heavily involved in the cocaine trafficking. Michael Rios described the system for distributing cocaine in 2003 and 2004 during his testimony.  The Mafia received about a kilo of cocaine each week. (T. 1237-1238).  The cocaine was controlled by the general of the Mafia, **Appellant Jimmy Zavala** and broken down into ounces by  **Sammy Garcia.** (T. 1238-1240).The lieutenant for each section of the city was given nine ounces of cocaine, about $4000 worth, each week and he was responsible for distributing the cocaine as he saw fit. (T. 1237-1238).  **Appellant Garcia-Esparza** was the lieutenant for the

north side during this time period. (T. 1223-1224). One of the taped phone calls refers to **Gira (Appellant Garcia-Esparza)** paying for an ounces of cocaine (T. 1249).

It is also clear that **Appellant Garcia-Esparza** was also deeply involved in collecting the 10% tax. In a call taped by the government, **Appellant Garcia-Esparza** was discussing with **Jimmy Zavala** whether the Flores sisters, who were selling drugs would be required to pay the 10% (T. 1390-1391; Call 559). In short, the government's evidence that **Appellant Garcia-Esparza** conspired with other members of the Mexican Mafia to possess heroin with intent to distribute it was overwhelming.

**B.    The three distribution of heroin counts in March, 2004. (Counts Seventeen, Eighteen, and Nineteen).**

The three March, 2004 counts charging **Appellant Johnny Garcia-Esparza** and his sergeant Juan Valdez, a/k/a "Fly" with distribution of heroin were supported by sufficient evidence. Jesse Arceo testified at trial that he and a partner owned a bar in San Antonio (T. 1470-71). Arceo was not selling drugs out of his bar and neither was his partner (id.). They were making a comfortable living (id.). They were first approached by **Appellant Jimmy Zavala** who told them they owed him money for selling drugs out of the club (T. 1471). They told him they were not selling drugs

(id.). While Areceo did not identify the men who accompanied Jimmy Zavala that day, he said they were very serious and were not very friendly (T. 1472). **Jimmy Zavala** told Arceo he was with the Mexican Mafia and that they owed him $25,000 (T. 1472). Even though Arceo denied selling drugs, **Zavala** threatened them, their business and their families (T. 1473). **Zavala** made it very clear to Arceo what would happen and they knew their lives were in danger (id.).

Arceo told the jury that running the bar had become a nightmare and he and his partner decided to just get out of the business (T. 1473). They started paying $500 a week, which was all the money they were making (T. 1474). They decided to sell the business because they were scared (T. 1477). They sold it to Huerro Henry Cantu, a member of the Bandidos Motorcycle Club (T. 1478). After Cantu made a down payment, they turned the bar over to Cantu and he began to run it (T. 1479). Shortly after that Cantu was brutally killed in front of the Silverado bar (T. 1479-80). The day before Cantu was killed he got a call from **Jimmy Zavala** (T. 1481-82). Arceo explained that he was with Cantu that day when he got a call and he recognized **Zavala's** voice (T. 1482).

It was six months after Cantu's death before they opened up the club again (T. 1483). Shortly after they did **Appellant Jimmy Zavala** showed up at the club again

(T. 1483). He told Arceo there was still an unpaid balance of $25,000 (id.). Arceo and his partner again started making payments on a weekly basis (id.).

It was then that Arceo got a visit from **Appellant Johnny Garcia-Esparza "Gira"** and his sergeant "Fly." (T. 1485). He left Arceo a message because Arceo wasn't there (T. 1486; Govt. Ex. 1100, 1101, 1103). Arceo called the number, spoke to Appellant Garcia-Esparza and later met with him (T. 1488-89). He met **Appellant Garcia-Esparza** at a Sears, at a Hooters, and a Home Depot and he paid him (T. 1501-1502; Govt. Ex. 102, 113, 1109, 1104, 1104TR). When they later met at McDonalds, there was a discussion of heroin (T. 1515-1524; Govt. Ex. 1112, 1112TR). **Appellant Garcia-Esparza** told Arceo he wanted to help them pay, but it was going to be with heroin and they were going to sell it (T. 1518-1524). **Appellant Garcia Esparza** asked them if they wanted one ounce or a half ounce and he said the heroin cost $600. (T. 1529-1530). The next day they delivered the money to a Division Mart, gave money to "Fly" and took the heroin (T. 1531). The money had been supplied by the DEA and there were DEA agents watching them (T. 1532).

They made several payments to **Appellant Garcia-Esparza** and then money and heroin were exchanged again (T. 1533). Then on March 30, 2004 there was another meeting at Taco Cabana with Fly where another ounce of heroin was

delivered (T. 1533).    Money was delivered again at Banana's Billiards, Church's Chicken and Conns (T. 1534-38).

Even after Appellant **Garcia-Esparza** and **Zavala** were arrested, Jesse Arceo got phone calls and visits about money owned to the Mafia.  There were instances where people come by his office and simply waited outside without coming in (T. 1578).  Arceo's testimony was corroborated by the testimony of agents who observed the meetings, conducted surveillance, took pictures, and provided the $4700 for the extortion payments and the $1800  to purchase the heroin from **Garcia-Esparza** (T. 1581-1596; Govt. Ex. 1107, 1108, 1116).  Agents received the heroin purchased from **Appellant Garcia-Esparza**.   (Govt. Exs. 1143, 1144, 1145).

**C.  The April 22ⁿᵈ 2004 possession with intent to distribute count (Count Twenty).**

On April 22, 2004, a member of the DEA task force was conducting surveillance (T. 1751).  He was directed to an address on Taft Blvd. in San Antonio which was the residence of Mexican Mafia member Roger Rodriguez (T. 1751).  The officer saw **Appellant Sammy Garcia's** blue thunderbird arrive at the residence (T. 1751-52).  Earlier that day, officer had intercepted a call between Michael Rios and **Appellant Garcia Esparza** (T. 1751-53, Call 702).  **Garcia-Esparza** told Michael Rios to send Sam to "Pelon's" as "he has it there."  Michael Rios explained that in

this call Garcia-Esparza was directing him to send **Sammy Garcia** to pick up the heroin (id.). He explained that "chicle" means heroin and the reference to Sam was to **Sammy Garcia** (T. 1753). There was another intercepted call that same day between Rios and **Appellant Garcia-Esparza** in which they discuss getting it from Pelon and taking it to Corky (T. 1755, Call 704).

Once Appellant **Sammy Garcia** left the residence, an officer attempted to stop him but **Sammy Garcia** failed to stop (T. 1756). There were two marked units pursuing **Sammy Garcia** and it turned into a high speed chase (T. 1757, 1836-1840; Govt. Ex. 1601). **Appellant Sammy Garcia** was eventually stopped but before he was officers saw several objects being thrown from the vehicle (T. 1841-42). One of the objects was a large sized baggie (T. 1842). A bag of heroin was later recovered in that area by DEA agents with the help of a drug-sniffing canine (T. 1844, 1947; Govt. Ex. 1605). Two thousand dollars was found in **Sammy Garcia's** car, rolled up and hidden in the air conditioning console (T. 1842). After the chase but before the heroin was located, **Appellant Sammy Garcia** called **Appellant Johnny Garcia-Esparza** and told he that he had the stuff with him, that he ran, that he got rid of "that shit" and that he "beat em." (T. 1872-1874, Call 463).

42

**D.  Conspiracy to Possess Firearms and Possession of Firearms- Counts Thirty and Thirty One**

The evidence supports the jury's verdict that Appellant Garcia Esparza was guilty of conspiring to use, carry and possess multiple firearms and assault weapons during, in relation to, and in furtherance of a drug trafficking crime and that he possessed firearms in furtherance of the conspiracy, a drug trafficking crime.  The government proved at trial that a cache of 50 firearms were kept by the Mexican Mafia in a secret location.  During the execution of a search warrant on April 29, 2004, law enforcement officers located approximately 50 firearms which consisted of 12 gauge shotguns, assault rifles, and pistols. ( T. 1801-1803; 272-276; Govt. Ex. 901-949).   Carlos Lopez, a member of the Texas Mexican Mafia, testified that he took possession of the Mafia's weapons and moved them to his cousin's shed on Proctor Street where they were ultimately found by law enforcement officers (T. 2039-2040).  Lopez explained that when someone refused to pay the 10% tax or the "dime" charged by the Mafia, and Mafia members were planning to "jack" them, Appellant **Garcia-Esparza** would call him and say he wanted a couple of handguns and assault rifles, because they were going to do a home invasion.  (T. 2040-2041; 269-270).  The authority to have a weapon issued was vested in the general, the captain or lieutenants (T. 618).  **Appellant Garcia-Esparza** had the power to

43

authorize the release of a weapon from the stash house (id.) . **Garcia-Esparza** would call, but he did not personally pick the weapons up.  Rather, he would send one of his soldiers to pick them up.  While Carlos Lopez was in charge of keeping the firearms, Appellant called requesting guns 3 or 4 times (id.).

**Appellant Garcia Esparza** clearly had control of the weapons.  It was at his direction that the weapons were released to the Mexican Mafia "soldiers."  The weapons were used in connection with a drug trafficking crime, the conspiracy to possess with intent to distribute the heroin charged in Count One.  As Lopez described in his testimony, the Mexican Mafia furthers its drug distribution conspiracy by controlling the distribution of illegal drugs by non members by requiring them to pay a tax for the privilege of selling narcotics.  The failure to pay the tax resulted in theft of all of the person's property, a home invasion, or serious bodily injury, robbery, or death.  Weapons were used to pick up the tax or the dime and at the home invasions (608-610).

The government also proved constructive possession of the weapons as alleged in Count Thirty One.  Count Thirty One charged **Appellant Garcia-Esparza** and others of possession of the cache of 50 firearms discovered on April 29, 2004. As discussed above, the government introduced testimony from Carlos Lopez  that the weapons were for the use of Mexican Mafia members and that they were issued at the

direction of Appellant Garcia-Esparza. (1800). While a Mexican Mafia soldier was in charge of storing the weapons, **Appellant Garcia-Esparza** was in control of those weapons.

### E. Money Laundering Conspiracy -Count Thirty Three.

Appellant **Garcia-Esparza** argues the evidence supporting the money laundering conspiracy charge was insufficient. In the indictment, the government alleged that Appellant **Garcia-Esparza** and 27 others did "conduct and attempt to conduct financial transactions affecting interstate and foreign commerce, described below, which involved property which was the proceeds of specified unlawful activity, to wit, the illegal distribution of controlled substances, with the intent to promote the carrying on of said specified unlawful activity, To wit: by collecting a mandatory "tax" on the proceeds of narcotics sold in exchange for granting the seller of narcotics authorization to sell narcotics, in violation of 18 U.S.C. § 1956(a)(1)(A)(I)."

Appellant asserts that there was no evidence that **Appellant Garcia-Esparza** "gave over to the care or possession of another money." (Appellant's brief at 18). The government disagrees. This was a money laundering conspiracy charge. Appellant was a lieutenant, a ranking officer, in a criminal organization that had as one of its purposes the collection of the "tax." There is ample evidence in the record

that this money was turned over to others. During the execution of search warrants, the government found money order receipts showing funds being sent to various inmates in Texas and federal Prisons (Govt. Ex. 3011, 3012). The government also found applications for inmate trust accounts which were used provide prisoners with money.

One of the inmate accounts had the name Alonzo, which is the last name of the Mexican Mafia vice president who was in prison (Govt. Ex. 30111-3013, 3015, 3015b). A ledger was also recovered showing money going to an inmate trust account at Bexar County Jail (T. 2315-2316). One witness testified that money from the drug sales goes to the top and then to the ranchos- the federal penitentiary and the state prison units for the needs of the members ( R. 772-773). The objects of the conspiracy alleged in the indictment included controlling the distribution of controlled substances by taxing those who sold, using the tax to buy controlled substances and to support and maintain the conspirators. Despite Appellant's claim, the government sufficiently proved funds from drug sales and the 10% were turned over to others.

## II.  THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION WHEN IT DENIED APPELLANTS' MOTION FOR A MISTRIAL

**Appellants Zavala, Valles, Garcia and Garcia-Esparza** all contend the district court erred when it denied their motion for a mistrial.  They claim the court should have granted the motion for a mistrial which was made after government witness Luis Adame showed his scars to the jury from the witness stand.  All Appellants assert this demonstration was prejudicial and could not be cured with an instruction.  The government disagrees.

### A.  Standard of Review and Legal Framework.

This Court reviews the denial of a motion for mistrial for an abuse of discretion.  *United States v. Dupre*, 117 F.3d 810, 823 (5th Cir. 1997).  If the motion involves the presentation of allegedly prejudicial testimony before a jury, a new trial is required only if there is a significant possibility that the prejudicial evidence had a substantial impact upon the jury verdict, viewed in light of the entire record.  *United States v. Paul*, 142 F.3d 836, 877 (5th Cir. 1998).  This Court gives great weight to the district court's assessment of the prejudicial effect of objectionable testimony.  *See United States v. Nguyen*, 28 F.3d 477, 483 (5th Cir. 1994).  Further, a prejudicial remark may be rendered harmless by a curative instruction to the jury.  *Id.*

**B. Background.**

The following occurred in the courtroom. Government witness Luis Adame took the stand. Due to extreme nervousness or a panic attack, Adame explained he needed a break before testifying (T. 2501-02, 2529). He was permitted two breaks (id.). When Adame finally began testifying he told the jury that he was a former member of the Mexican Mafia (T. 2544). He was released from prison in 2000 and sometime later he was introduced to **Appellant Jimmy Zavala** (T. 2544-47). The person introducing the two men was Appellant **Johnny Garcia-Esparza**, "**Gira.**" **Garcia Esparza** told Adame he had to report to the Mafia on the north side of San Antonio and he said that Appellant **Jimmy Zavala** was in charge of the north side. (T. 2544-47).

The next time Adame had any interaction with Appellant **Jimmy Zavala** was in 2003 when **Zavala** and **Appellants Garcia-Esparza** and **Valles** arrived (id.). Adame was selling cars on a car lot when they showed up (id.). **Appellant Zavala** asked Adame if he had any cocaine to sell and he told them he had 5 keys (T. 2544-48). **Zavala** agreed to the sale, took the cocaine, and deducted $33,000 from the agreed price. Adame protested. (2 R. 2548). Adame explained they effectively took 3 kilos of cocaine from him without paying for it (T. 2549-2250). Adame explained they were angry at him because he had refused to collect the ten percent (T. 2549-50).

48

Appellants **Zavala**, **Valles**, and **Garcia Esparza** came back to see Adame again in March of 2003.  They showed up and said he owed $30,000 in back taxes (T. 2552).  **Jimmy Zavala** got upset and told Adame he was taking his motorcycle and his truck until he could pay the $30,000, however, when Adame returned with the money**, Zavala** and the others refused to give him the truck or the motorcycle back (T. 2533).   About 4 weeks later, Adame received a call from **Jimmy Zavala** who wanted to meet with him (T. 2554).  Adame told him he was tired of having his stuff taken and he did not want to be a member of the Mafia anymore (T. 2554).

Adame next received a call from a member of the Mafia who said he had received a call from **Appellant Valles** and **Valle**s indicated a "green light" had been placed on Adame.  A green light is an order to kill someone.  The person who was supposed to kill Adame was **Appellant Valles** (T. 2557-58).

Adame testified he did not see any of the Appellants until three months later when he was driving to his house (T. 2559).  He had changed addresses because he knew he was in danger (id.). After he got out of his car, a car approached and **Appellant Valles** jumped out of a van and started shooting at him with a gun in each hand.   Adame testified he ran and then called 911, telling them he had been shot (T. 2559).  He was hit several times (id.).  Three shots hit him (T. 2560).  He passed out and ended up in hospital for a month, month and a half (T. 2560).   He was in a

wheelchair and, for a time, his wife had to feed him (T. 2560).  Appellant identified **Appellant Valles** in the courtroom (T. 2560). Adame indicated he still had a "green light" on him (T. 2561).

On cross examination by **Appellant Juan Valles's** attorney, Adame was asked about his father, who was nicknamed "Blue" like the witness (T. 2574-75). Counsel asked Adame if his father had been killed by the Mexican Mafia (T. 2575).  Adame answered that his father had been killed by the Mexican Mafia and that they had shot half his face off (referring to his father) (T. 2575).  The attorney then examined Adame as to why he would join the Mexican Mafia after what happened to his father. He asked, "You must not have thought much of your dad, huh?"  Adame explained that he joined the Mafia because he did not want to get killed (T. 2575).  Counsel then asked if Adame had quit the Mexican Mafia (T. 2579). Adame explained he quit when they started taking all of his things.  Then counsel posed the following question, "You didn't get fed up when they started shooting your family, killing your father. It wasn't until they started taking your stuff that you decided to quit, you were fed up with this?"  The witness explained he didn't really know his dad (T. 2577).  Counsel posed the same kind of question again, asking Adame to confirm that he didn't decide to quit the Mafia when his dad was killed; rather he only decided to quit when they were taking his stuff (id.).  The witness again explained that his father was in prison

for most of Adame's life (id.).  Counsel interrupted and asked the witness if he had

heard the question.   The witness was answering the question when counsel

interrupted stating the following:

COUNSEL: You know, it is surprising, it's surprising how much trouble you
had talking earlier - -
ADAME: In June.
COUNSEL: this morning but you can't shut up now.  Wait till I ask you a
question.  Now was that all some big act earlier that you came out here with that
production you made that you couldn't talk?
ADAME: Do you want to see my wounds.
COUNSEL: Did you hear what I asked you.
ADAME: No, it wasn't a big act.
COUNSEL: You weren't wounded in a courtroom were you?
ADAME: No.
COUNSEL: You weren't wounded when you were surrounded by U.S.
Marshals, were you?
ADAME: I was scared.  I started getting anxiety attacks.
COUNSEL: You weren't wounded by people on this jury, were you?
ADAME: No.
COUNSEL: But yet you made that big production out here this morning that
you couldn't talk because these people scared you?
ADAME: No, because they scared me.
. . .
On redirect, the government asked the following:
PROSECUTOR: Just to make sure you didn't make up this whole shooting
thing, will you stand up and show us your scars?

At that point, Counsel objected and the Court sustained the objection. (T.

2591). Adame was then cross examined again by counsel for **Juan Valles**. Adame

was asked why he had denied knowing who shot him when the police questioned him

after the incident:

COUNSEL: Do you remember telling him - - and here the complainant is you. Do you remember telling him that you, Luis Adame, "said he didn't know any of the people that got out of that van shooting at him"?

COUNSEL: Do you remember saying that, yes or no?

ADAME: The reason I said that is because - -

COUNSEL: Yes or no?

ADAME: I wanted to get them myself.

COUNSEL: Yes or no?

ADAME: I wanted him myself.

THE COURT: Wait, wait.

ADAME: This is what he did to me.

THE COURT: Wait. Sit down.

ADAME: He shot me.

THE COURT: Get him out of here. Out, out, out.

MARSHALL: Step this way, please.

THE COURT: I don't have time for nonsense. Out. And I'm going to tell the prosecution don't ever bring someone who's just going to show a lot of nonsense. Next witness.

COUNSEL: May his testimony be - -

THE COURT: It's all struck. Let's go.

COUNSEL: Motion to disregard.

THE COURT: Motion to disregard. Just pretend the gentleman was never there.

. . .

COUNSEL: I'm sorry, Your Honor. I need to make a motion for a mistrial.

THE COURT: I understand. That's denied. Thank you. The motion is made as to each defendant and it's denied as to each defendant.

**C. The prejudice resulting from showing the scars didn't deprive the defendant's of a fair trial.**

All Appellants argue the witness's showing of the his scars was so prejudicial,

their motions for mistrial should have been granted. This contention is wholly

meritless. First, Adame's showing the jury the scars from his gunshot wounds was

not so prejudicial it could not be cured by an instruction. Adame had already testified, without objection, that he had been shot by **Appellant Valles**, that he had been hospitalized for an extended period of time and that his wife had to feed him by hand during the recovery. No one ever disputed the fact that Adame was in fact shot. His showing the jury his scars helped prove the fact of injury, which was undisputed. Adame had already testified **Valles** was the person who shot him. The fact he showed the scars did not prejudice any of the defendants. It certainly did not cause undue prejudice.

**D. The display occurred during cross-examination and was arguably invited.**

When a contested remark or outburst comes from a witness, this Court seeks to determine whether it was spontaneous or prompted by the prosecutor. *United States v. Moreno,* 185 F.3d 465, 472-73 (5th Cir. 1999). The witness' display of his scars occurred during cross examination. It did not occur while the prosecution was conducting direct examination. It happened when defense counsel was questioning the witness about the shooting and suggesting he did not really know who shot him. Right before Adame exhibited his scars, he had undergone a grueling and emotional cross examination. Defense counsel questioned Adame about the anxiety attacks he had when he entered the courtroom, suggesting he was faking. Adame was

questioned about his father's death at the hands of the Mexican Mafia and had told the jury that half of his father's face had been blown off. He had been repeatedly asked why he didn't quit the Mafia after his father's death and the questioning appeared designed to make it appear the witness was more concerned about his material possessions than his father. Then the examiner suggested, through questioning, that Adame did not really know who shot him. Given the fact the witness was already emotional and afraid, defense counsel's cross examination was designed to intentionally provoke an angry response from the witness, a tactic often used to discredit a witness by getting the witness to lose control. Given this tactical decision by defense counsel, the spontaneous demonstration by Adame of his scars on cross examination was invited error. *See United States v. Raymer,* 876 F.2d 383, 387-88 (5th Cir. 1989).

## E. The district court's instructions cured any prejudice.

The district court struck all of the testimony and instructed the jury to disregard the testimony. Judge Garcia told the jury, "Just pretend the gentleman was never there." In addition to the contemporaneous instruction, the court, as part of its general instructions told the jury, "During the trial I sustained objections to certain questions. You must disregard those questions entirely. Do not speculate as to what the witness would have said if permitted to answer the question. As I told you during

54

the trial, I also struck the entire testimony of Luis Adame, and you are instructed to disregard his testimony in its entirely. You shall not consider any part of his testimony for any reason whatsoever. Your verdict must be solely based on the legally admissible evidence and testimony." (T. 2654).    The district court instructed the jury twice. Once right after the display and then again before the jury deliberated. The court was very clear in its instruction that the jury was not to consider any of the witness's testimony for any purpose. This Court has repeatedly held that a prejudicial remark may be cured by a limiting instruction. *See Paul*, 142 F.3d at 844.

In *United States v. Wallace*, 32 F.3d 921, 927 (5th Cir. 1994), a witness, during cross examination made  unsolicited angry remarks. After his credibility was attacked on cross the witness stated, "If you are so interested in my credibility-you wanted to see my PSI report earlier-I will be more than happy to submit my PSI report and a lie detector test if your co-defendants will do the same." *Id.* at 927. Although the defendants in *Wallace* conceded that the government had nothing to do with the outburst, like the defendants in this case, they argued they were so prejudiced, they were entitled to a new trial. This Court, in *Wallace*, disagreed, finding that any prejudice was cured by the court's instruction. The district court had advised the jury that the witness's statement was inappropriate, non-responsive and should be striken. *Id.* The jury was told that polygraphs were inadmissible and that the statement should

55

not be considered in any way in the deliberations. *Id.* Here, the district court gave similar instructions, once when the display of the scars occurred and again before the jury deliberated. Therefore, as in *Wallace,* any prejudice was cured by the court's instructions.

**D. If there was error, it was harmless because the other evidence of guilt was overwhelming.**

It is highly improbable that Adame's lifting his shirt and showing his scars had a substantial impact on the jury's verdict in light of the other overwhelming evidence of all of the Appellants' guilt presented at trial. This action constituted only a small portion of the case. After the district court struck Adame's testimony, the government did not mention the scars, did not mention Adame's testimony and focused on other evidence during its closing argument.

The evidence of guilt was overwhelming. As set forth in the facts section above, the evidence of the conspiracy charged in Count One is overwhelming. Moreover, it is undisputed that all of the Appellants were members of the Mexican Mafia and were involved in the drug dealing and collecting the ten percent. The same is true for the weapons violations charged. A cache of weapons was discovered. Testimony established the weapons were for the use of Mexican Mafia members in collecting the 10 percent and in enforcing or extorting the money from people.

Therefore, when carrying out the objects of the conspiracy alleged in Count One, all of the defendants possessed and used the stored weapons.  The substantive drug counts were well supported by the evidence.  Any prejudice arising from Adame's showing of the scars would not have prejudiced the jury in deciding whether or not Appellants actually possessed the heroin or cocaine as charged.  Again, as set forth above, all Appellants were members of the Mexican Mafia, they were part of an organization that had as its purpose the sale and distribution of heroin and cocaine. Testimony at trial proved that the Mafia sought to increase its involvement in selling drugs and sought to improve its sources. In addition, members of the Mafia were caught in possession of heroin or cocaine. **Juan Valles** delivered heroin to Mercy Brooks, a confidential informant.

On January 29, 2004, **Appellant Juan Victor Valles**, a/k/a Smiley sold 23.3 grams of heroin to a confidential informant, Mercy Brooks.  Brooks, who was working for investigators, began calling Mafia members in order to arrange for the purchase of heroin. (T. 934-936).  He was ultimately directed to **Valles** as a person who could get the heroin for him (T. 954-55).  The Mafia member who referred Brooks to **Valles** did so because he knew he had heroin since he had just purchased an ounce from him in the last month (T. 2094-95).  The calls were intercepted and played to the jury. In the call between **Appellant Valles** and Brooks, **Valles** arranged

to meet Brooks at specific locations. (T. 949-950, 954-55). Brooks was searched prior to the buy and surveillance watched Brooks and observed **Valles** arrive in a red Dodge truck as **Valles** said he would during the call (T. 949-956, 997 1003-06, 1016-25; Govt. Exs. 1001-1008). **Valles** was the only person in the vehicle (T. 1025).When Brooks returned, he produced heroin purchased from **Appellant Valles** ( T. 1006; Govt. Ex. 1004 ). When **Valles** was in jail, he told another Mafia member, who became a government witness, that Mercy Brooks was snitching on him and **Valles** admitted to selling some heroin to Brooks (T. 1118-1119). **Valles** said he sold some stuff to Mercy and Mercy was wired which was why he was in jail (T. 1144). As discussed elsewhere, Mercy Brooks was killed after Appellants were arrested before the trial in the instant case began (id.). The sale to Brooks certainly wasn't an isolated event. As a lieutenant in the Mafia, Appellant **Valles** was in charge of distributing heroin and cocaine in his section of the city. Testimony of a member of the Mafia established **Valles** was regularly engaged in drug trafficking. The member reported to Juan **Valles** when he got out of prison (T. 1039). **Valles** funded him and fronted him with cocaine to get him started in the business.

**Jimmy Zavala** was repeatedly identified at trial as the individual who was in charge of distributing cocaine in the Mafia. He was also involved in heroin trafficking. One member who had gotten out of jail explained that Jimmy and others

58

set him up with an ounce of black tar heroin, fronting it to him (T. 1097-1100). They provided the member with as much as he could sell (T. 1100). On April 22, **Jimmy Zavala** and government witness Michael Rios were arrested and found in possession of a kilo of cocaine (T. 1426).

As described earlier, Sammy Garcia was pursued by officers after he was observed picking up drugs. Officers saw him toss packages out his car window. They later found the package which contained 23.9 grams of heroin.

With regard to the money laundering conspiracy, one of the stated purposes of the Mafia was to make money selling drugs and collecting the "tax", use the money to buy more drugs, and provide for the needs of its members, including those who were in prison. As set forth above, documents obtained during the execution of a number of search warrants showed funds flowing in to the Mafia from its drug operations and being sent to inmates all over the country in federal and state prisons. Therefore, the district court did not abuse its discretion in denying Appellants' motion for a mistrial

Two Appellants claim that the motion for mistrial should have been granted not only because of the Adame's "prejudicial display of his torso" but because his testimony was perjured. Appellant suggests that because the witness previously made a conflicting statement to police, he perjured himself when he said Appellant Juan

59

**Valles** shot him. While the witness's testimony was inconsistent with his prior statement, Adame explained the conflict by telling the jury that he wanted to get that person himself. While the answer did not reflect well on Adame, it was credible. Adame did not tell police who shot him because he wanted to kill **Valles** himself. There is nothing in the record that establishes that Adame perjured himself when he testified.

In conclusion, the district court did not abuse its discretion in failing to grant the motion for a mistrial. The display was not overly prejudicial, the court's instructions cured any prejudice, and the other evidence against the defendants was overwhelming.

### III. APPELLANT FAILED TO SUFFICIENTLY ALLEGE TRIAL COUNSEL WAS INEFFECTIVE

**Appellant Garcia-Esparza** argues that his trial counsel was ineffective. In order to prevail on his ineffective assistance claim, **Appellant Garcia-Esparza** must show that his attorney's performance was deficient and (2) this deficient performance prejudiced him. *Strickland v. Washington*, 466 U.S. 668 (1984). To satisfy the first part of the test, Appellant must demonstrate that the alleged errors of his attorney were so serious that the assistance he received was below the constitutional minimum guaranteed by the Sixth Amendment. 466 U.S. at 686. The second part of the test

requires Appellant to show that his trial counsel's performance so  prejudiced his defense that his trial or sentencing was fundamentally unfair or unreliable.  *United States v.Faubion*, 19 F.3d 222, 228 (5th Cir. 1994).  Failure to satisfy either prong is fatal to Appellant's claim. *Id.*

Review of counsel's performance is highly deferential and counsel is presumed to have rendered adequate assistance. *Strickland*, 466 U.S. at 687-690; *Burger v. Kemp*, 483 U.S. 776, 789 (1987). He asserts counsel was ineffective at sentencing because he "failed to argue effectively the judge's adherence to the presentence report."  He gives no reasons why this was ineffective except to say, "The PSR called for 720 months instead of the range above, noted, 352-425 months."  He also claims counsel failed to object to the trial testimony of Luis Adame.

Because of the brevity of Appellant's argument  and his failure to state what items Appellant's counsel should have objected to at sentencing, Appellant's claims of ineffective assistance of counsel at sentencing cannot be addressed by the government or considered by this Court.  He quite simply fails to specify what sentencing decisions trial counsel should have objected to and why.  Therefore, he does not meet his burden.

Appellant does assert trial counsel failed to object to the testimony of Luis Adame.  While Appellant's claims may be specific enough to address, Appellant

cannot show prejudice. First, an attorney for another defendant objected to the display of Adame's scar. In response, the court struck all of Luis Adame's testimony and told the jury to pretend like Adame had never testified. One of the other attorneys made a motion for a mistrial and the district court stated it was considering it to be a motion for all of the defendants. The court then declined to grant the motion. Therefore, Appellant can show absolutely no prejudice arising from counsel's failure to object to Adame's testimony.

In the alternative, this Court generally does not allow claims for ineffective assistance of counsel to be resolved on direct appeal when those claims have not been presented before the district court, since no opportunity existed to develop the record. *United States v. Brewster*, 137 F.3d 853, 859 (5th Cir.1998). Review is not accorded in most instances because the record is rarely sufficiently developed on the issue of attorney competence. *Id.* Here, there is no information from the attorney concerning these issues. No affidavit was filed and no issue was presented in district court. Because the record in this case is not developed and will not permit this Court to fairly the merits of the claim, Appellant's claim should not be considered by this Court. *United States v. Navejar*, 963 F.2d 732, 735 (5th Cir. 1992).

## IV.  APPELLANT DID NOT HAVE A RIGHT TO ENTER A PLEA IN FRONT OF THE JURY

Appellant Juan **Valles** argues that he had the right to enter his plea in front of the jury.  He fails to point out where in the proceedings he sought to enter his plea in front of the jury.  Therefore, it is not clear that he even asked the district court to enter his plea in front of the jury.  Having failed to ask the district court, he has most certainly waived the issue.

Further, Appellant candidly admits he has no authority to support his assertion. A review of opinions of this Court reveals no case which supports Appellant's argument.  Rather, several cases suggest in may be an error to permit a criminal defendant to plead in front of a jury. *See United States v. Richardson*, 504 F.2d 357, 360 (5th Cir. 1974); *United States v. Webster*, 734 F.2d 1048, 1053 (5th Cir. 1984)(referring to having the defendants enter their plea in front of a jury as an unusual practice and noting that the problems inherent in such a procedure militate against its continued use).  Because Appellant failed to establish he had a right to enter his plea in front of the jury and because cases from this Court suggest such a practice poses problems, Appellant's point of error should be rejected by this Court.

63

## V.  THE DISTRICT COURT DID NOT ERR IN SENTENCING JIMMY ZAVALA

Appellant **Jimmy Zavala** argues on appeal that the district court erred when it considered the murder of Jose Luis Moreno as a factor in sentencing him.  He submits that because the jury failed to find that he was guilty of knowingly and intentionally murdering Moreno, the district court's use of the murder at sentencing was error.  He makes several arguments which are addressed below.

### A.  The Supreme Court's decision in *Booker* did not overrule its decision in *Watts*.

Appellant argues that Supreme Court's decision in *United States v. Booker*, 543 U.S. 220(2005) casts doubt on the Supreme Court's prior decision in *United States v. Watts*, 519 U.S. 148 (1997).  In *Watts*, the Supreme Court held that  conduct a defendant was acquitted of may be used at sentencing.  *Id.* at 157.  This Court has repeatedly recognized that it must follow a Supreme Court's decision unless and until the Supreme Court decides to overrule it.  *United States v. Garcia-Mejia*, 394 F.3d 396, 398-399 (5th Cir. 2004),overruled on other grounds, 545 U.S. 1102 (2005).  Because the Supreme Court has not overruled *Watts*, *Watts* is still controlling. *See Agostini v. Felton,* 521 U.S. 203, 237 (1997)(stating "the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions").

64

This Court has made it clear that *Booker* does not cast doubt on the validity of *Watts*. Recently in *United States v. Pineiro*, __F.3d. __, 2006 WL 3234353 (5th Cir. Nov.9, 2006), this Court stated that "[u]nder both the pre- and post-*Booker* regimes, a jury's verdict of acquittal on some drug-quantity counts does not prevent the sentencing court from considering conduct underlying the acquitted count as long as that related conduct has been proved by a preponderance of the evidence." *See also United States v. Duncan,* 400 F.3d 1297, 1301 (11th Cir. 2005)(rejecting a defendant's argument that a special verdict by the jury finding the conspiracy involved only cocaine powder and not crack cocaine precluded increasing his sentence because of cocaine base and stating that "*Booker* does not suggest that the consideration of acquitted conduct violates the Sixth Amendment as  long as the judge does not impose a sentence that exceeds what is authorized by the jury verdict." ).

Appellant's claim that the district court could not use the Moreno murder in sentencing him is "meritless." *United States v. Valdez*, 453 F.3d 252, 256 (5th Cir. 2006). In *Valdez,* 453 F.3d at 264, this Court held that sentencing defendants for quantities of cocaine was permitted even though the jury had acquitted the defendants of the cocaine charges. The Court explained that a "jury's verdict of acquittal does not prevent the sentencing court from considering conduct underlying the acquitted charge so long as that conduct has been proved by a preponderance of the evidence."

*Id. citing United States v. Cathey*, 259 F.3d 365, 368 (5ᵗʰ Cir. 2001); *Watts*, 519 U.S. at 157.

Appellant cites *United States v. Pimental*, 367 F. Supp 143, 152 (D. Mass. 2005) and a concurring opinion in *United States v. Faust*, 456 F.3d 1342, 1352 (11ᵗʰ Cir. 2006) in support of his argument that using acquitted conduct at sentencing violates the Fifth Amendment due process rights. (Appellant's Brief at 24). While both support Appellant's position, Appellant fails to point out that the majority in *Faust* followed the Eleventh Circuit's decision in *United States v. Duncan*, 400 F.3d 1297, 1304-05 (11ᵗʰ Cir.), *cert. denied*, 126 S.Ct. 432 (2005) and held that *Watts* survived *Booker*. [5] The *Faust* Court explained that in Justice Stevens opinion in *Booker* he stated that none of the Supreme Court's prior cases were inconsistent with the *Booker* decision, specifically discussing *Watts*. *Faust*, 456 F.3d at 1348; *Booker*, 543 U.S. at 240-241.

Appellant's argument also disregards the fact that every Court of Appeal to consider this issue has decided that *Watts* is still good law that survives *Booker*. *See Faust*, 456 F.3d at 1347, n. 5 (listing cases). Moreover, while Judge Barkett's opinion in *Faust* was technically a concurring opinion, it was effectively a minority

---

[5] In *Duncan*, the Eleventh Circuit held that nothing in *Booker* prohibits courts from considering relevant acquitted conduct when the sentencing guidelines are applied as advisory. *Id.*

opinion.  Although Judge Barkett  acknowledged that *Duncan* was Eleventh Circuit precedent and it had to be followed, he stated he believed that precedent was wrong. Therefore, Judge Barkett's arguments, which are cited by Appellant in support of his argument, were clearly rejected by the other two judges on the panel.   The Eleventh Circuit, in both the majority portion of the *Faust* opinion, and in *Duncan*, agree with the Fifth Circuit that acquitted conduct may be used at sentencing without violating a defendant's constitutional rights so long as it is proved by a preponderance of the evidence and the sentence does not exceed the statutory maximum for the offenses the defendant was convicted of.

**B.  The district court did not clearly err when it decided Appellant Zavala murdered Moreno.**

 **Appellant Jimmy Zavala** submits that the district court clearly erred in concluding he was responsible for Moreno's murder.  The government disagrees.  The evidence was more than sufficient to prove the murder by a preponderance of the evidence. A Bexar County Deputy Sheriff assigned to the Homicide Division testified that he investigated the death of Jose Luis Moreno (T. 2525).  Moreno was initially reported missing (T.2526).   During the investigation, officers learned that in July, 2002 Moreno had rented a vehicle. (id.).  The vehicle was found in South Bexar County and it had been burned (T. 2526; Govt. Ex. 4503).  Officers also discovered that

67

Moreno was a member of the Mexican Mafia (T. 2525). On October 15, 2003, human remains were found in South Bexar County on property that belonged to the father of Mexican Mafia member Ray Carrasco (T. 2527-37). Officers found bones, a jaw, a man's watch and a Michigan baseball cap (T. 2538-39). The skeleton was not intact (id.). The remains were identified as Jose Luis Moreno (T. 2538-39, 2601).

A Mexican Mafia member and friend of Moreno's, Joe Rene Tamayo, also testified at the trial. His testimony provided clear circumstantial evidence that proved **Jimmy Zavala** was responsible for the murder of Moreno. Tamayo testified that Moreno was the Mexican Mafia lieutenant on the north side of San Antonio. In mid-July, 2002, Tamayo got a call from Casper, a member of the Mexican Mafia (T. 2605). The call was in the middle of the night at about 2:30 a.m. (T. 2608). Casper told Tamayo they needed to do a "cook out." (T. 2608). The term "cook out" was code for a procedure the Mexican Mafia used to get rid of weapons that had been used, for getting rid of evidence (T. 2608-10). According to the rules or the custom of the Mexican Mafia, the person who used the gun would present it to Tamayo and he would torch it (T. 2610-12). That night in July, they arranged to meet at a place on the West side they used to torch firearms (id.). **Appellant Jimmy Zavala** showed up there with a gun (id.).

Tamayo described **Jimmy Zavala** as "shooken up and scared." (T. 2612-13). Jimmy Zavala put the gun on a plate that night and Tamayo torched it (id.). Tamayo testified that based on the Mexican Mafia's practice, he believes that **Jimmy Zavala** used the gun that day (id.). It was Mafia practice that the person who used the gun delivers it to be destroyed (id.). After the firearm was torched, **Jimmy Zavala** still looked scared (T. 2614). The next day Tamayo saw **Jimmy Zavala** and he was still shaken up (T. 2635-36).

After they left the area on the west side where the weapon was torched, Casper directed Tamayo to dispose of the vehicle. (T. 2614-15). The vehicle belonged to Moreno (id.). Tamayo explained that both he and Casper had gas cans (id.). He filled up the gas cans and drove the truck, which he knew belonged to Moreno, towards Castroville, parked it on the side of the road and burned it (id.). He knew it was Moreno's truck because he recognized it as his friend's truck; he also saw receipts in the truck belonging to Moreno (id.).

Tamayo's testimony provides a link between the delivery and torching of the gun that night and the torching of Moreno's vehicle. The fact that Moreno's vehicle was torched the same night the gun was delivered supports the inference that Moreno was killed that night and **Appellant Zavala**, along with other Mexican Mafia members, was destroying both the weapon he had used and Moreno's vehicle. This

connection is further established by Tamayo's testimony that on the backside of Moreno's truck that night he saw "bloody handprints sliding down the back windshield" (T. 2616-17). A fact finder could easily determine that **Zavala** delivered the gun that night because he was involved in and responsible for Moreno's murder.

Tamayo's testimony also provided a motive for the murder. Tamayo explained that **Jimmy Zavala**, was hanging out with the Mexican Mafia and wanted to become a member. The day before the gun was delivered to Tamayo to be torched, Appellant **Zavala** had talked about Moreno (T. 2616-17). **Zavala** indicated he did not trust Moreno, that Moreno was doing drugs and he was probably a snitch working for the Feds (id.). After Moreno was killed and the truck was burned, **Jimmy Zavala** became a member of the Mexican Mafia (T. 2616-17). He was given the position of lieutenant of the north side, the position in the Mafia that had belonged to Moreno until he was killed (T. 2636).

Other testimony indicated that to become a member of the Mexican Mafia a person had to have a sponsor. Individuals usually joined the Mexican Mafia while they were in prison. It was rare for a person who had not been to prison to be admitted into the Mexican Mafia. To gain admission, the person would be required to do what was called a "cameo." A cameo required a non-member to kill someone the Mafia had targeted in order to become a member. While there is no direct testimony that Jimmy

70

**Zavala** was ordered by the Mexican Mafia to hit Moreno, the circumstantial evidence indicates that is what occurred. **Zavala** came with Casper, a member of the Mafia to a place and a person the Mafia used to destroy weapons. After the murder, **Zavala** became a member of the Mafia and took the murder victim's rank.

In addition to the evidence presented at trial, the PSR contained the following information:

> On July 9, 2002, Jose Luis Moreno was shot in the back of the head and transported to another location where he was buried. His body was later discovered and identified through dental records. The investigation of this murder revealed a "green light" was issued because the former vice president, Carlos Rodriguez, suspected Moreno was working as an informant. Rodriguez was also upset because Moreno had an outstanding drug debt of $10,000. The murder was discussed during an organization meeting that included Rodriguez, Bill Silva, Alfonso Flores, Ray Carrasco, and Alejandro Guerrero. It was then agreed that **Jimmy Zavala** would kill Moreno and that Moreno would be buried on Carrasco's sister's property in Bexar County. Moreno was last seen leaving his home with **Jimmy Zavala**. Moreno was led to believe they were going to a home to take valuables as the people did not want to pay the dime. While in the residence, which belonged to **Zavala's** girlfriend, **Zavala** shot Moreno. Moreno was transported to the Bexar County property in his own vehicle which was burned.

**Zavala** PSR ¶ 24. While Appellant argued he did not commit the murder, he failed to show the facts in the PSR was materially untrue. Post-*Booker* the defendant retains the burden to show that the information in the PSR relied on by the district court is materially untrue. *United States v. Betancourt*, 422 F.3d 240, 248 (5th Cir. 2005).

Therefore, the district court was entitled to rely on the facts in the PSR and the testimony presented at trial in determining Appellant Zavala was responsible for the murder of Moreno. *United States v. De Jesus Batres*, 410 F.3d 154, 164 (5th Cir. 2005).

It is well settled that "a presentence report generally bears sufficient indicia of reliability to be considered as evidence by the trial judge in making factual determinations." *United States v. Alford*, 142 F.3d 825, 831-32(5th Cir. 1988); *see also United States v. Ayala*, 47 F.3d 688, 690 (5th Cir. 1992). The district court may adopt facts contained in the PSR without inquiry, if the defendant fails to present competent rebuttal evidence. *United States v. Parker*, 133 F.3d 322, 329 (5th Cir. 1998). This Court has made it clear that "[s]uch rebuttal evidence must demonstrate that the PSR information is "materially untrue, inaccurate or unreliable." *Id.* Mere objections do not suffice as competent rebuttal evidence. *Parker*, 133 F.3d at 329.

Given all of the evidence presented at trial and set forth in the Presentence Report, the government sufficiently proved by a preponderance of the evidence that Jimmy Zavala participated in the murder of Moreno. This Court finds clear error only if it is left with the definite and firm conviction that a mistake has been made. *United States v. Pofahl*, 990 F.3d 1456 (5th Cir. 1993). The district court did not make a mistake. Appellant failed to establish clear error.

**C. In any event, any error in applying the murder guideline was harmless.**

Appellant **Zavala** does not  argue the district court's alleged error in finding

he had murdered Moreno affected his sentence.  It is clear from the record that even

if the district court had not found Appellant Zavala  murdered Moreno and had not

computed his sentence under the murder guideline, Zavala's range for imprisonment

under the advisory guidelines for Count One would have been nevertheless been life

imprisonment.  As set forth above, Appellant **Jimmy  Zavala** was charged and

convicted of six counts: the Mexican Mafia drug conspiracy (Count One); possessing

cocaine with intent to distribute in violation of 21 U.S.C. §  841(a)(1) and

841(b)(1)(B)(Count Twenty One); conspiracy to use, carry and possess a firearm in

furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c) and 18 U.S.C.

§ 2 (Count Thirty); using, carrying or possessing a firearm in furtherance of a drug

trafficking crime in violation of 18 U.S.C. § 924(c) and 18 U.S.C. § 2 (Count Thirty

One);  using, carrying or possessing a firearm in furtherance of a drug trafficking

crime in violation of 18 U.S.C. § 924(c) and 18 U.S.C. § 2 (Count 32);  conspiracy to

money launder in violation of 18 U.S.C. § 1956(a)(1)(A)(i)(Count Thirty Three).

Had his advisory guideline range been computed without regard to the murder

guideline, he would have had an offense level of at least 46.  Applying the drug

guideline  or  the  money  laundering  guideline  if  these  offenses  were  grouped,

73

Appellant's base offense level would have been at least 38 due to the quantity of drugs involved. (See **Johnny Garcia Esparza**'s PSR ¶ 49 in which the probation officer found the offense level, based on the distribution of more than 150 kilograms of cocaine and over 30 kilograms of heroin resulted in a base offense level of 38.). Two levels are added because **Appellant Zavala** was convicted under 18 U.S.C. § 1956. U.S.S.G.§ 2S1.1(b)(2)(B). Appellant's role as an organizer or leader of criminal activity that involved five or more participants and was otherwise extensive requires the addition of 4 more offense levels under U.S.S.G.§ 3B1.1(a). The obstruction of justice enhancement adds 2 levels. This brings **Appellant Zavala's** offense level to 46. With a Criminal History of I and an offense level of 46, Appellant's range for imprisonment under the advisory guidelines for Count I is Life.

Therefore, even if there was error in finding Appellant murdered Moreno and applying the murder guideline, Appellant would have nevertheless had a guideline range of life imprisonment. Since the district court sentenced him within this advisory range, his sentence should be affirmed.

## VI. THE DISTRICT COURT'S JUDICIAL FACT FINDING AT APPELLANT GARCIA-ESPARZA'S POST BOOKER SENTENCING DID NOT VIOLATE *BLAKELY* OR *APPRENDI*

Appellant argues that his 720 month sentence violated *Blakely v. Washington*, 542 U.S. 296 (2004) and *Apprendi v. New Jersey*, 530 U.S. 466 (2000). He submits

that Appellant's sentence could not be increased based on judge-found facts (Appellant's Brief at 20). Appellant fails to state which judge-found fact he is contesting. Moreover, he fails to recognize that increasing a sentence based on a judge found fact was only unconstitutional when the Sentencing Guidelines were mandatory. Since Appellant was sentenced after *Booker*, when the guidelines are simply advisory, there was no error in basing a sentence on judge found facts. When sentenced under an advisory scheme, the Sixth Amendment does not prevent a district judge from making factual findings relevant to sentencing. *See United States v. Mares*, 402 F.3d 511, 517-19 (5th Cir.), *cert. denied*, 126 S.Ct. 43 (2005).

## VII. THE DISTRICT COURT DID NOT ERR IN FINDING APPELLANT SAMMY GARCIA WAS AN ORGANIZER OR LEADER EVEN THOUGH THE JURY DID NOT MAKE THIS FINDING

Appellant **Sammy Garcia** challenges his sentence. When the jury retired to deliberate, the verdict form asked them to decide if they found, beyond a reasonable doubt that **Sammy Garcia** was a leader or organizer of the Conspiracy alleged in Count One of the indictment. The jury answered no. (T. 395).[6] The district court, relying on the Pre-sentence Report found that **Appellant Sammy Garcia** was an

---

The jury was asked the following question, "Do you find beyond a reasonable doubt that SAMMY GARCIA was a leader or organizer of the conspiracy alleged in Count One of the Indictment? [Answer Yes Or No]." The jury answered "No." (4 R. 395).

organizer under the advisory Guidelines.  This decision increased Appellant **Sammy Garcia's** offense level by 2 levels.

## A.  There was no violation of Booker or Apprendi.

Appellant claims that in light of the jury's finding, the sentence, which was based in part on the finding he was an organizer of criminal activity, was in violation of *Blakely v. Washington*, 542 U.S. 296 (2004) and *United States v. Booker*, 543 U.S. 220, 258 (2005).

Appellant is incorrect.  In *United States v. Valdez*, 453 F.3d 252, 264 (5th Cir. 2006), this Court considered a similar argument. The defendants, Hector and Cesar Valdez, were convicted of conspiracy to possess, with intent to distribute, marijuana and of aiding and abetting the possession, with intent to distribute, marijuana.  *Id.* at 256.   The jury found both of the Valdez brothers not guilty of charges that they possessed cocaine with the intent to distribute.  *Id.*   At sentencing, the district court included the cocaine in the defendants' relevant conduct calculation.  Hector Valdez argued on appeal that the cocaine could not be included in relevant conduct because the jury acquitted him of those charges.  *Id.*  This Court rejected the argument, stating it was "meritless."   The Court explained that a "jury's verdict of acquittal does not prevent the sentencing court from considering conduct underlying the acquitted charge so long as that conduct has been proved by a preponderance of the evidence."  *Id.*

*citing United States v. Cathey*, 259 F.3d 365, 368 (5th Cir. 2001); *United States v. Watts*, 519 U.S. 148, 157 (1977). Sentencing a defendant for acquitted conduct does not run afoul of the Supreme Court's decision in *Booker*. As this Court stated last month in *United States v. Pineiro*, __F.3d. __, 2006 WL 3234353 (5th Cir. Nov.9, 2006), "[u]nder both the pre- and post-*Booker* regimes, a jury's verdict of acquittal on some drug-quantity counts does not prevent the sentencing court from considering conduct underlying the acquitted count as long as that related conduct has been proved by a preponderance of the evidence. *See also United States v. Duncan,* 400 F.3d 1297, 1301 (11th Cir. 2005)(rejecting a defendant's argument that a special verdict by the jury finding the conspiracy involved only cocaine powder and not crack cocaine precluded increasing his sentence because of cocaine base and stating that "*Booker* does not suggest that the consideration of acquitted conduct violates the Sixth Amendment as long as the judge does not impose a sentence that exceeds what is authorized by the jury verdict." ). In this case, a life sentence was authorized by the jury's verdict. The district court did not exceed that limit.

Other Circuits considering this issue have reached the same conclusion. *See United States v. Radtke,* 415 F.3d 826, 844 (8th Cir. 2005)(holding that, in determining whether the district court had correctly calculated fraud loss, "the jury's acquittal - - establishes only that there was reasonable doubt as to [the defendant's] involvement

with such conduct and the district court was still free, indeed obliged, to consider whether his involvement had been proved by a preponderance of the evidence."); *United States v. Vaughn,* 430 F.3d 518, 526-27 (2nd Cir. 2005); *United States v. Price*, 418 F.3d 771, 787-88 (7th Cir. 2005)("We join all other courts that have confronted the issue in holding that the Supreme Court's holding in *Watts* remains the law after *Booker*."); *United States v. Magallanez*, 408 F.3d 672, 684-685 (10th Cir. 2005)(When a district court makes a determination of sentencing facts by a preponderance test under the now advisory guidelines, it is not bound by jury determinations reached through application of the more onerous reasonable double standard). It is clear the district court did not violate *Booker* when it considered acquitted conduct in sentencing Appellant **Sammy Garcia**.

Appellant does not claim the district court's factual findings were erroneous or that the enhancement was unsupported by a preponderance of the evidence. Therefore, Appellant's request that his sentence be reversed should be denied.

**B. If there was any error, it is completely harmless.**

In the alternative, if there was error, it was harmless. The addition of the two offense levels due to role in the offense, did no affect the computation of the advisory guideline range. Appellant **Sammy Garcia** was convicted on four Counts and was sentenced to a total of 660 months imprisonment (8 R. 314, 321). He received 600

months imprisonment on Count One, and 240 months on Counts Twenty and Thirty Three, to run concurrently (8 R. 321). The 60 month sentence on Count Thirty Two, the firearms charge, was to be served consecutively to the other sentences (8 R. 321). Appellant **Sammy Garcia** asserts that if the district court had not made the finding that he was a leader or organizer, the guideline range for Count One would have been 262 -327 months, instead of the 420 months to life range that was calculated in the PSR. (Appellant's brief at 19).

Appellant is mistaken. Appellant would have received the exact same sentence whether or not he was found to be an organizer. Appellant's advisory guideline range was computed as follows: Appellant had a base offense level of 38 (PSR ¶ 49). Two (2) levels were added because Appellant was convicted under 18 U.S.C. § 1956. *See* U.S.S.G.§ 2S1.1(b)(2)(B). Due to the court's finding Appellant was an organizer of criminal activity, another two levels were added bringing the total offense level to 42. U.S.S.G.§ 3B1.1(c) (PSR ¶ 56).

Appellant's prior convictions for Delivery Of Heroin, Assault Bodily Injury, Delivery of Heroin, Driving While Intoxicated, and two convictions for Possession of a Controlled Substance resulted in 12 criminal history points (PSR ¶ 62-69). Because Appellant was on parole at the time of the instant offense, 2 points were added giving

Appellant 14 criminal history points and a Criminal History Category of VI (PSR ¶ 70-72).

With a criminal history Category of VI and an offense level of 42, Appellant's advisory guideline range for all counts (except the firearms count) was 360 months to life. Because Appellant was also convicted of possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c) and the consecutive sentence for that offense was 60 months, the guideline range was 420 months to life after the 60 month sentence was added. *See* **Sammy Garcia's** PSR at paragraph 92. The district court's sentence of 660 months fell within this range.

If the district court had not assigned the 2 levels for a role as an organizer, Appellant's guideline range for all counts (except the firearms count) would still be 360 months to life. See U.S.S.G.§ Sentencing Table. An offense level of 40 and a Criminal History Category of VI results in a guideline sentencing range of 360 months to life. When the 60 months for the 18 U.S.C. § 924(c) count is added, the guideline range is the same, 420 months to life.

Therefore, even assuming the district court erred in applying the organizer enhancement, the error was completely harmless. Whether or not the 2 levels were added, the advisory guideline range would have been the same.

## VIII.  THE DISTRICT COURT DID NOT ERR IN MAKING FACTUAL FINDINGS AT SENTENCING

**Appellant Valles** argues the district court not sentence him for certain amounts of narcotics and for being a leader or organizer absent jury findings on the issue. Appellant's issue is without merit.  Post-*Booker* the district court sentenced Appellant under the advisory guidelines.  *Booker,* 543 U.S. at 245-46.  When sentenced under an advisory scheme, the Sixth Amendment does not prevent a district judge from making  factual findings relevant to sentencing.  *See United States v. Mares*, 402 F.3d 511, 517-19 (5th Cir.), *cert. denied*, 126 S.Ct. 43 (2005).

## CONCLUSION

For the foregoing reasons, Appellants convictions and sentences should be affirmed.

Respectfully submitted,

JOHNNY SUTTON
United States Attorney

By:
ELLEN A. LOCKWOOD
Assistant United States Attorney

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that true and correct copies of the foregoing Brief for the United

States have been mailed to the following attorneys and Appellant Garcia:

Edward L. Bravenec                Bowen W. Sutton
Attorney-at-Law                   Attorney-at-Law
721 South Presa                   115 East Travis, Suite 1001
San Antonio, Texas 78210          San Antonio, Texas 78205


Vincent D. Callahan, III          Adrienne Urrutia Wisenberg
Attorney-at-Law                   Attorney-at-Law
226 East Magnolia Ave.            1711 N Street NW, 2nd Floor
San Antonio, Texas 78212          Washington, DC 20036

on this the 14th day of December, 2006.



ELLEN A. LOCKWOOD
Assistant United States Attorney
Western District of Texas
601 N.W. Loop 410, Suite 600
San Antonio, Texas  78216
(210) 384-7090